2017 IL App (2d) 141203
No. 2-14-1203
Opinion filed June 9, 2017

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 11-CF-262 |
| ANTWON L. DISMUKE, | ) ) ) | Honorable Susan Clancy Boles, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE ZENOFF delivered the judgment of the court, with opinion.
Justice McLaren concurred in the judgment and opinion.
Justice Burke specially concurred, with opinion.

**OPINION**

¶ 1    Defendant, Antwon L. Dismuke, appeals from his conviction of being an armed habitual

criminal (720 ILCS 5/24-1.7(a)(1) (West 2010)), following a jury trial in the circuit court of

Kane County.  For the reasons that follow, we reverse and remand for a new trial.

¶ 2                                I. BACKGROUND

¶ 3    The following facts are those necessary for an understanding of the case.  We will discuss

additional facts as required in the Analysis section of this opinion.

¶ 4                              A. Pre-Indictment

¶ 5                           1. The July 13, 2009, Shooting

¶ 6     In the early morning hours of July 14, 2009, David Adams, an evidence technician with the Aurora police department, was dispatched to the scene of a vehicle struck by gunfire on July 13, 2009. When he arrived, he saw two orange cones marking the locations of bullet fragments in the roadway on Kane Street. Inside an area taped off with crime scene tape, Adams observed an unoccupied silver Isuzu Ascender. Adams learned from the patrol officers that this was the vehicle that was struck by gunfire. The vehicle had been occupied by three undercover police officers when it was fired upon.

¶ 7     Adams's examination of the exterior of the Isuzu revealed that one bullet struck the driver's-side rear door and another bullet struck the driver's-side fender above the rear wheel. There was also damage from a bullet striking the rear hatch door. The SUV's interior exhibited a bullet hole in the rear door that corresponded to the bullet hole on the outside of the door. A white backpack lay on the rear seat. Adams found a bullet fragment on top of it. He collected all three bullet fragments as evidence, but he submitted only the two found in the roadway for examination by the Illinois State Police Crime Laboratory, because the bullet fragment on the backpack was too deformed for examination.

¶ 8                                  2. The Search Warrant

¶ 9     On November 19, 2009, the police searched defendant's home in Aurora pursuant to a warrant. They did not find the gun that was used in the July shooting.

¶ 10                                 3. Derrick Smith

¶ 11    Derrick Smith was arrested in Du Page County in January 2010. He gave the Aurora police information regarding the shooting of July 13, 2009, hoping for leniency in exchange for his information. According to Smith, he was at defendant's home in Aurora in July 2009, the morning after the shooting. He was in the kitchen with defendant and Silas Strickland.

Strickland received a call, and then he looked up something on the Internet. Strickland divulged that he had shot at a vehicle, thinking that it contained rival gang members. Strickland gave defendant a .44 Magnum, a black long-barrel revolver with a brown grip, and instructed him to get rid of it. Defendant took possession of the revolver.

¶ 12   Derrick Smith told the police that he was again with defendant and Strickland around Thanksgiving or Christmas 2009, when defendant told Strickland that he had not disposed of the revolver. Defendant stated that the police did not find the revolver when they "raided" his house. Strickland again instructed defendant to dispose of it.

¶ 13                                    4. June 30, 2010

¶ 14   Defendant and his next-door neighbor, Ismail Quintana, shared a common driveway. Quintana's building was a former single-family residence that he used as a real estate office. On the morning of June 30, 2010, as Quintana walked to the front entrance of his building, he noticed a piece of wood in the driveway next to his back stairs that was not there the evening before. Wooden lattice work surrounding the stairs was broken. When Quintana stooped to look at the damage, he saw a black plastic garbage bag stuffed under the stairs. He poked it with a stick and felt the outline of a gun. He called the police.

¶ 15   The police seized the garbage bag. Inside was a blue towel wrapped around a .44 Magnum, a black long-barrel revolver with a brown grip. Forensic analysis proved that this gun was used in the shooting of the Isuzu.

¶ 16                                 B. The Indictment

¶ 17   On April 20, 2011, the Kane County grand jury charged defendant in a three-count indictment. Count I alleged that "on or about" June 30, 2010, defendant committed the offense of being an armed habitual criminal in that he knowingly possessed a firearm "after having been

convicted two or more times of the offenses of manufacture/delivery of a controlled substance [in] Macon County, manufacture/delivery of a controlled substance [in] Kane County, and aggravated discharge of a firearm [in] Kane County." Count II alleged that "on or about" June 30, 2010, defendant committed the offense of unlawful possession of a firearm by a felon (720 ILCS 5/24-1.1(b) (West 2010)), and count III alleged that "on or about" June 30, 2010, defendant committed the offense of unlawful possession of a weapon without a firearm owner's identification card (430 ILCS 65/2 (West 2010)). Prior to trial, the State dismissed counts II and III. On April 29, 2014, the State filed an amended charge of being an armed habitual criminal, alleging that defendant had previously been convicted of delivery of a controlled substance, a Class 2 felony, and aggravated discharge of a firearm, a Class 1 felony. Defendant did not contest the previous convictions at trial.

¶ 18                           C. Defense Motion *in Limine* No. 7

¶ 19    Prior to trial, defendant filed a series of motions *in limine*. At issue in this appeal is No. 7, pertaining to the introduction of evidence of the shooting. Defendant maintained that the shooting was irrelevant to whether he possessed the revolver. The court ruled that the *fact* of the shooting was relevant to show that the gun defendant allegedly possessed was the one Strickland gave him after the shooting. However, the court ruled that the details of the shooting were irrelevant and prejudicial: "To get into any details that involved officers *and all that* (emphasis added) *** the prejudice of that would outweigh the probative value."

¶ 20                                      D. Trial

¶ 21    At the beginning of *voir dire*, the court admonished the venire as to "certain principles of law that apply to all criminal cases." Defendant refers to these principles as "the four basic principles of law": (1) the presumption of innocence; (2) the State has the burden of proof;

(3) the defendant is not required to offer evidence on his own behalf; and (4) the defendant's failure to testify cannot be used against him. See Ill. S. Ct. R. 431(b) (eff. July 1, 2012) (codifying *People v. Zehr*, 103 Ill. 2d 472 (1984)). We refer to these principles as the "*Zehr* principles."

¶ 22 The court instructed the entire venire to raise hands if the potential jurors did not "understand or accept these principles or don't agree with them." Just prior to that instruction, the court had instructed the venirepersons *not* to raise their hands if they *did* understand, agree with, and accept the principles. The court then recited each principle followed by a different question: "Is there anyone who has any *difficulty or disagreement* with this proposition of law?" (Emphasis added). The court instructed the venirepersons to raise their hands if they did. No hands were raised. Defense counsel did not object to the court's handling of the *Zehr* principles. The court then seated 12 potential jurors in the jury box, and the attorneys commenced their questioning.

¶ 23 After 12 jurors had been chosen and sent from the courtroom, the bailiff ushered in another group from whom two alternates would be chosen. This group was not present for the court's earlier admonishments as to the *Zehr* principles. Following the attorneys' acceptance of two alternate jurors, the court for the first time told the alternates that it would explain the *Zehr* principles. The court further explained that not raising their hands signified that they understood and accepted those principles. The court stated that, if they raised their hands, it would signify that they did not accept or understand the principles or did not agree with them. The court recited the *Zehr* principles and inquired after each recitation whether either of the alternate jurors had "any difficulty or disagreement" with the stated principle. Neither raised a hand. The court

then had the entire jury, including the two alternates, sworn. On the second day of trial, one of the alternate jurors replaced a juror who was excused for illness.

¶ 24    In its opening statement, the State made clear its theory that defendant continuously possessed the gun from July 2009, when Strickland handed it to him, to June 30, 2010, when Quintana found it.

¶ 25    Quintana testified as recounted above. Additionally, he testified that people congregated at defendant's home and left garbage, like beer packages, in the common driveway. According to Quintana, defendant was present at his own house only a couple of times a week. Quintana saw garbage bags like the one holding the revolver strewn about every day. Typically, Quintana cleaned up the mess, but he did not do so on the evening of June 29, 2010. Nor did he notice anything out of the ordinary when he left his real estate office that evening.

¶ 26    On June 30, 2010, Aurora police officer Michael Carrasco and his partner responded to Quintana's call, which reported his finding a gun under his back steps. Carrasco called in evidence technicians, and Officer Armando Montemayor responded to the scene. Montemayor examined the plastic bag containing the revolver for DNA and fingerprints. He observed a partial fingerprint on it, placed the fingerprint on a lift card, and turned it over to the police department's latent fingerprint examiners. Later, laboratory analysis determined that there was insufficient DNA on the gun to warrant further testing. Montemayor also observed hairs on the blue towel in which the gun was wrapped. He submitted the hairs to the Illinois State Police Crime Laboratory for analysis. Montemayor testified that he found no fingerprints on the gun or the bullets inside the chamber.

¶ 27    Robert Berk of the Illinois State Police Crime Laboratory testified that the hairs found on the towel were "human Negroid hairs," possibly from three different people, and that it was not possible to conduct DNA analysis on them.

¶ 28    When the State announced that it would call Adams to testify, defendant renewed his objection to the admission of any evidence concerning the shooting.  Over defendant's objection, Adams was allowed to testify to details of the crime scene.  Additionally, the State introduced 12 color photographs to illustrate Adams's testimony.  Those photographs depicted the exterior bullet holes in the vehicle, the interior bullet hole in the rear passenger door, a close-up of the bullet fragment on the backpack in the back seat, and close-ups of the bullet fragments on the pavement.

¶ 29    The State next introduced a fingerprint card depicting defendant's fingerprints, taken at the Kane County jail on November 19, 2009.

¶ 30    Julie Smith, an independent fingerprint examiner, testified that she compared defendant's known fingerprints from the card taken at the Kane County jail to the partial print on the plastic garbage bag in which the revolver was found.  She concluded that the print on the garbage bag was a partial left thumb print that matched defendant's.  She revealed that the last step in her analysis, before she could submit her report, was to have another examiner verify her results.  The State asked Smith who verified the results, and defendant objected without stating a basis.  The court overruled the objection, and Smith testified that Gina Mineti verified her results.

¶ 31    Derrick Smith testified as narrated above, except that he was precluded from testifying that Strickland told defendant that he (Strickland) used the gun to shoot at a vehicle.  Instead, Smith testified that he was aware of a shooting and was present in defendant's kitchen the next morning when Strickland gave a .44 Magnum revolver to defendant with instructions to get rid

of it. Additionally, Smith acknowledged seeking favors in exchange for his testimony. According to Smith, the prosecutors told him that, if he testified truthfully, they would write a letter recommending that he receive credits, work release, or home monitoring. The State also gave Smith a written "proffer contract," promising him immunity from prosecution related to any statements he made to authorities concerning the July 13, 2009, shooting, if, in the authorities' opinion, his statements were truthful. On direct examination, Smith testified that Strickland was in defendant's kitchen when he took the revolver from his waistband and handed it to defendant. On cross-examination, he acknowledged that earlier he had stated that Strickland picked the gun up from a table and gave it to defendant.

¶ 32    Aurora police officer Steve Stemmet testified to executing the search warrant for defendant's home on November 19, 2009. On direct examination, the prosecutor directed Stemmet not to say whether anything was found during the search; rather, the prosecutor specifically asked if a revolver like that recovered from under Quintana's stairs was found in the search. Stemmet answered "No." Stemmet testified that when defendant was taken into custody the night of the search, on unrelated charges, he waived his rights on a written form and agreed to speak with the police. Defendant denied any knowledge of the shooting on July 13, 2009. Stemmet testified that he and Detective Sergeant Wallers of the Aurora police spoke with defendant again on October 18, 2010. Defendant again waived his rights on a written form. Stemmet asked defendant if he knew that he could not "touch, hold or possess any firearms because he was a convicted felon," and defendant replied that he was aware of that.

¶ 33    On cross-examination, defense counsel established that, when executing a search warrant, the police open cupboards and drawers and look in areas where things could be hidden. On redirect examination, the prosecutor asked Stemmet: "You, in fact, did look into drawers during

[the search of defendant's home], correct?" Stemmet answered: "Yes." The prosecutor asked: "Was cannabis found in those drawers?" Stemmet answered: "Yes, sir." The prosecutor then asked: "And a gun was found underneath a couch, correct?" Stemmet answered: "Yes, sir." The prosecutor then clarified in a leading question that it was a "different type of gun" than the revolver found by Quintana.

¶ 34 Wallers testified that he was the lead detective investigating the July 13, 2009, shooting. He also testified that the vehicle was occupied by three people. He testified that, after speaking with Derrick Smith, the police considered defendant a suspect in the shooting. Wallers interviewed defendant on January 21, 2010, and defendant denied knowledge of the July 13, 2009, shooting or the gun that was used in that shooting. Wallers and Stemmet spoke with defendant again on October 18, 2010. Wallers testified that defendant told them that he had information about the shooting but demanded to speak with an assistant State's Attorney before he said anything. When Wallers refused to summon a prosecutor, defendant indicated that he was willing to talk anyway. Defendant stated that, around midnight on July 13, 2009, he was walking a lady through his kitchen when he heard someone say, "Be careful out there, we just shot at some Kings around the corner." Defendant also stated that, a couple of days later, he went to a Marathon gas station near his house and talked to Smith. According to defendant, Smith tried to sell him some guns, including a .44 Magnum. Defendant told Wallers that Smith said that he was not trying to sell the gun used in the shooting and that he had thrown that gun in the river. According to defendant, Smith later said that he had buried that gun. Wallers then testified that he went to the Kane County jail on February 11, 2011, to speak with defendant on an unrelated case. When defendant would not speak with him, Wallers left a warrant with the

jail staff. Wallers further testified that he showed Smith a photo of the revolver Quintana found and that Smith identified it as the revolver Strickland gave to defendant. Then the State rested.

¶ 35 The court denied defendant's motion for a directed verdict, and defendant presented one witness. Tracy Newcomer, an investigator for the Kane County public defender's office, testified that she interviewed Derrick Smith on August 12, 2013. Smith told Newcomer that he did not remember having a conversation with Strickland and defendant in November or December 2009, and he doubted that he told the police that such a conversation took place.

¶ 36 During its deliberation, the jury asked for a transcript of Derrick Smith's testimony. The court allowed the request, but informed the jury that it would take up to two hours to have the transcript ready. The record does not reflect whether the transcript was delivered to the jury. The jury found defendant guilty.

¶ 37                                    E. Posttrial Motions

¶ 38 The Kane County public defender filed a timely posttrial motion. The motion alleged, *inter alia*, that (1) the State failed to prove defendant guilty beyond a reasonable doubt, (2) the court erred in admitting evidence of the July 13, 2009, shooting, and (3) the court erred in admitting testimony relating to the execution of the search warrant at defendant's home. Defendant discharged the public defender and hired private counsel, who filed an amended posttrial motion. Pertinent to this appeal, the amended posttrial motion alleged that it was error to allow Julie Smith to testify to the fingerprint examination, because (1) she conducted it on behalf of the Aurora police department, which was biased, and (2) her testimony was unbelievable because she was unclear as to the date of the fingerprint card she used for comparison. On October 9, 2014, the court denied the amended posttrial motion. Defendant was sentenced to 13 years' imprisonment. He filed a timely notice of appeal.

¶ 39                                    II. ANALYSIS

¶ 40    Defendant contends that (1) he was not proved guilty beyond a reasonable doubt, (2) the court erred in admitting evidence of other crimes, (3) fingerprint analyst Julie Smith should not have been allowed to testify to hearsay, and (4) the court failed to comply with Illinois Supreme Court Rule 431(b) during *voir dire*.  Because we agree that defendant is entitled to a new trial, we will address his reasonable-doubt argument to determine whether retrial is appropriate.

¶ 41    First, defendant contends that proof of his possession of the revolver, *on any date*, depends upon the unreliable and uncorroborated testimony of Derrick Smith.  Defendant also argues that the State failed to prove that he either actually or constructively possessed the revolver on June 30, 2010.

¶ 42    When a defendant challenges the sufficiency of the evidence, our inquiry is limited to whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *People v. Cox*, 195 Ill. 2d 378, 387 (2001).  It is not our function to retry a defendant.  *People v. Clinton*, 397 Ill. App. 3d 215, 220 (2010). Rather, it is the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from the evidence.  *Clinton*, 397 Ill. App. 3d at 220.  Most particularly, it is the function of the jury to evaluate the credibility of witnesses. *People v. Willett*, 2015 IL App (4th) 130702, ¶ 90.

¶ 43    Section 24-1.7(a) of the Criminal Code of 1961 provides that a person commits the offense of being an armed habitual criminal if he or she "receives, sells, possesses, or transfers" any firearm after having been convicted a total of two or more times of any combination of certain listed offenses.  Here, the State introduced defendant's prior convictions of unlawful

delivery of a controlled substance (720 ILCS 570/401(d) (West 2000)) and aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 1996)).  Defendant does not contest that those convictions satisfied the statutory elements.  Defendant also does not contest that the revolver was a firearm.  The only issue is whether the State proved beyond a reasonable doubt that defendant received and possessed the revolver.

¶ 44    Possession can be established by evidence of actual possession or constructive possession.  *People v. Scott*, 152 Ill. App. 3d 868, 871 (1987).  Actual possession is proved by testimony showing that the defendant exercised dominion over the contraband.  *Scott*, 152 Ill. App. 3d at 871.  Constructive possession exists without actual personal present dominion, but with the intent and capability to maintain control and dominion over the contraband.  *Scott*, 152 Ill. App. 3d at 871.  Mere access by other persons to the area where the contraband is found does not defeat constructive possession.  *Scott*, 152 Ill. App. 3d at 871.  Actual possession and constructive possession are two distinct theories under which a defendant may be proved guilty of the crime of possession.  *People v. Dismuke*, 2013 IL App (2d) 120925, ¶ 16.

¶ 45    Defendant isolates two instances and challenges the sufficiency of the proof as to each instance.  The first instance was in July 2009, when Strickland gave defendant the revolver and told him to get rid of it.  The second instance was the June 30, 2010, discovery of the revolver under Quintana's stairs.  Derrick Smith testified that he was present in defendant's kitchen when Strickland got a phone call, checked something on the Internet, and then gave the revolver to defendant with instructions to get rid of it.  Defendant emphasizes that proof of this incident depends entirely on Smith's credibility.

¶ 46    Derrick Smith was a convicted felon, who was facing prison time.  He gave the police the information because he admittedly wanted leniency.  He obtained the prosecutors' conditional

promise to write a letter urging that he be given consideration. The State also gave Smith conditional immunity from prosecution for anything he told prosecutors about the shooting. Defendant argues that it is possible that Smith was involved in the shooting. Defendant told Wallers that Smith admitted that he either threw the gun in the river or buried it. Further, defendant maintains that Smith was impeached when he testified that Strickland got the gun from his waistband but had earlier stated to authorities that Strickland picked the gun up from a table. Finally, defendant maintains that Smith was impeached with his statement to Newcomer in which he denied being present when defendant told Strickland that the police did not find the revolver when they executed the search warrant.

¶ 47    With respect to the discovery of the revolver on June 30, 2010, defendant argues that (1) he was not present, (2) others had access to the area where the revolver was found, and (3) defendant's partial thumb print on the plastic bag containing the gun must be disregarded because Julie Smith's testimony concerning the identification of the thumb print was hearsay.

¶ 48    The inconsistency in Derrick Smith's testimony about whether Strickland got the revolver from his waistband or a table is trifling. According to Smith, defendant told Strickland that the police did not find the revolver when they searched his house. The testimony that the police executed a search warrant on defendant's property at about the time of this conversation corroborated Smith's testimony. The bullet fragments recovered by Adams at the scene of the shooting were matched to the revolver and tended to corroborate Smith's testimony that he was present the morning after the shooting when Strickland gave the revolver to defendant with orders to get rid of it. Smith testified that he did not want to talk to defendant's attorney or to Newcomer, which may explain why he denied the November or December conversation and told Newcomer that he did not tell the police about defendant's admission. Testimony can be found

insufficient under the *Jackson* standard only where the record compels the conclusion that no reasonable person could accept the evidence beyond a reasonable doubt. *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). We do not conclude that Smith's testimony was so lacking in credibility that no rational juror could accept it. Consequently, the State proved beyond a reasonable doubt that defendant possessed the revolver in July 2009.

¶ 49    If the June 30, 2010, incident is viewed on a continuum, rather than in isolation, it is circumstantial evidence that defendant moved the revolver after having possessed it continuously since July 2009. Assuming, without deciding, that the partial thumb print on the plastic bag was admissible, the print was probative, but not dispositive, of defendant's continuous possession. The thumb print could have been placed there at any time and did not definitively prove that defendant left it on the bag when the gun and towel were placed into the bag. The evidence showed that similar plastic garbage bags were routinely left on defendant's property. Nevertheless, assuming, without deciding, the *in*admissibility of the partial thumb print, the proximity of the revolver to defendant's house, coupled with defendant's statement to Strickland that the police did not find it when they searched his house in November 2009, was sufficient circumstantial evidence of defendant's continuous possession. Accordingly, we conclude that defendant was proved guilty of being an armed habitual criminal beyond a reasonable doubt and that defendant will not be exposed to double jeopardy upon retrial. See *People v. Macon*, 396 Ill. App. 3d 451, 458 (2009) (to prevent risk of exposure to double jeopardy after reversal for error, court will consider whether the State presented sufficient evidence to prove the defendant guilty beyond a reasonable doubt).

¶ 50    We next consider defendant's argument that the court's failure to comply with Rule 431(b) during *voir dire* requires a new trial. Rule 431(b) mandates trial courts to admonish and

question each potential juror on the *Zehr* principles. Ill. S. Ct. R. 431(b) (eff. July 1, 2012). The rule provides that the court "shall ask" each juror, either individually or in a group, whether he or she "understands and accepts" the *Zehr* principles. Ill. S. Ct. R. 431(b) (eff. July 1, 2012). In *People v. Thompson*, 238 Ill. 2d 598, 607 (2010), our supreme court made clear that the court must ask *both* whether the jurors *understand* and *accept* the principles.

¶ 51 Here, at the beginning of *voir dire*, the court admonished the entire venire as to the *Zehr* principles and instructed the potential jurors *not* to raise their hands "if [they] understand the principles, agree with those principles[,] and accept those principles." Then the court instructed the venirepersons to *raise* their hands if they did *not* "understand or accept these principles or don't agree with them." The court recited each principle and then asked the potential jurors whether they had any "difficulty" or disagreement" with the principle. After the parties accepted 12 jurors, the court brought five potential alternates, who were not present for the previous *voir dire*, into the courtroom. Following selection of two alternates, the court informed them that it would explain certain principles. The court instructed the alternates not to raise their hands if they understood, agreed with, and accepted those principles. The court then recited each of the *Zehr* principles, asking after each principle whether the alternates had any "difficulty or disagreement" with the proposition. Neither one did. The 12 jurors were brought back into the courtroom, and all 14 jurors were sworn. One of the alternates was substituted for a juror who was dismissed due to illness.

¶ 52 Defendant raises two issues: (1) the court did not inquire whether each juror understood the *Zehr* principles, and (2) the court instructed the alternates as to the *Zehr* principles only after they had been chosen. In *People v. Wilmington*, 2013 IL 112938, ¶ 32, our supreme court opined that it is arguable that the court's asking for disagreement, and getting none, is equivalent to juror

acceptance of the principles. The court also opined that the failure to ask jurors if they *understand* the principles "is error in and of itself." *Wilmington*, 2013 IL 112938, ¶ 32.

¶ 53    Rule 431(b) mandates "a specific question and response process." *Thompson*, 238 Ill. 2d at 607. The court "shall ask" whether the potential jurors *understand* and accept the enumerated principles. *Thompson*, 238 Ill. 2d at 607. Asking if they had any "difficulty or disagreement" was not equivalent to asking if they understood. For example, someone might not disagree with a statement simply because he or she does not understand it.

¶ 54    The inclusion of the court's entire colloquy with the venire by Justice Burke in his special concurrence demonstrates how unclear and inadequate the court's instructions were. First, the court instructed the potential jurors *not* to raise their hands if they understood, agreed with, and accepted the *Zehr* principles. Second, the court instructed the potential jurors to *raise* their hands in response to its question if they did *not* understand or accept the principles. Third, after reciting each principle, the court changed the question from "understand and accept" to "difficulty or disagreement." Thus, the potential jurors received three different instructions about what they were supposed to do with their hands. More problematic was the court's substitution of "difficulty or disagreement" for "understand and accept."

¶ 55    While Justice Burke contends that the word "difficulty" meant whether a potential juror had difficulty understanding or accepting the principle, there is no reason to reach this conclusion from the language that the court actually used. The court asked whether the potential jurors had any "difficulty or disagreement" with each principle. "Difficulty" is defined as "the quality or state of being difficult, or hard to do or to overcome," or a "disagreement" or "controversy." Webster's Third New International Dictionary 630 (1993). "Difficulty" is not, therefore, synonymous with "understanding." The court never repeated, or even alluded to, the

word "understand" in its questioning after the recitation of each principle. In sum, by using this confusing multi-task exercise, the court's method of inquiry failed to determine whether the potential jurors *understood* the principles. Rather than make the procedure so convoluted, it was necessary only to recite the principles and ask the potential jurors one question: whether they understood and accepted the principles. Accordingly, we hold that the court violated Rule 431(b).

¶ 56    We disagree with defendant that the court further violated the rule when it questioned the alternate jurors as to the *Zehr* principles only after they had been chosen. The appellate court specifically sanctioned that procedure in *People v. Willhite*, 399 Ill. App. 3d 1191, 1197 (2010), and *People v. Staple*, 402 Ill. App. 3d 1098, 1106 (2010). In *Willhite*, the court noted that the rule does not state a specific time when the court must question venirepersons either individually or in groups. *Willhite*, 399 Ill. App. 3d at 1197. The court approved of questioning after the prospective jurors had been chosen but before they were sworn, reasoning that the trial judge would be able to inquire further and remove any biased juror, if necessary. *Willhite*, 399 Ill. App. 3d at 1197. In *Willhite*, the court also approved of the trial court's method of inquiry, which gave each juror the opportunity to respond audibly to the judge's questions. *Willhite*, 399 Ill. App. 3d at 1196. Similarly, in *Staple*, the trial court gave the jurors the principles and received audible responses. *Staple*, 402 Ill. App. 3d at 1101-02.

¶ 57    The next question is whether the error requires reversal and remand for a new trial pursuant to plain-error review. It is undisputed that defendant did not preserve the error by objecting to the procedure at *voir dire* or in his posttrial motion. The plain-error doctrine allows a reviewing court to consider unpreserved error when a clear or obvious error occurred and (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice

against the defendant, regardless of the seriousness of the error, or (2) the error was so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process. *People v. Piatkowski*, 225 Ill. 2d 551, 564-65 (2007). In *Thompson*, our supreme court held that a violation of Rule 431(b) is not cognizable under the second prong of the plain-error doctrine. *Thompson*, 238 Ill. 2d at 611. Consequently, defendant argues that the evidence in the present case is so closely balanced that reversal of his conviction is required.

¶ 58   Whether the evidence is closely balanced is a separate question from whether the evidence is sufficient to sustain a conviction against a reasonable-doubt challenge. *Piatkowski*, 225 Ill. 2d at 566. In determining whether the evidence is closely balanced, we view the evidence in a commonsense manner in the context of the totality of the circumstances. *People v. Belknap*, 2014 IL 117094, ¶ 62. On June 30, 2010, Quintana found the revolver hidden under his stairs, within feet of defendant's property. The revolver was the same gun that Strickland gave to defendant. Defendant referred to the revolver when he told Strickland that the police did not find it when they searched his house in November 2009. Thus, a reasonable inference is that defendant moved the revolver from his house to the hiding place under Quintana's stairs, where he could maintain dominion and control over it. Additionally, defendant lied to Wallers about not knowing anything about the shooting or the revolver. In defendant's second interview with Wallers, he stated that Derrick Smith told him that he threw the revolver in the river or buried it.

¶ 59   Only the execution of a search warrant at defendant's house in November 2009 (where the police did not find the revolver) and the bullet fragments tended to corroborate Derrick Smith's testimony. Strickland did not testify.[1] The fingerprint on the garbage bag did not prove that it was placed there when the revolver was put into the bag. Similar garbage bags were

_____

[1] The record shows that Strickland was likely dead at the time of trial.

routinely strewn about defendant's property. The towel did not contain evidence that defendant handled it. The revolver and the bullets in the chamber did not contain any fingerprints or DNA. People were constantly congregating at defendant's house, including Smith, who testified that he was there "often."

¶ 60 Defendant's statement to Wallers puts Derrick Smith in possession of the revolver, leading to the inference that Smith was involved in the shooting. Smith was a convicted felon who sought leniency in exchange for telling the police about the revolver. The prosecutors gave Smith a proffer of immunity and agreed to write a letter recommending that he receive work release or home monitoring. Under the totality of the circumstances, we believe that the evidence is closely balanced. Accordingly, the court's failure to comply with Rule 431(b) requires reversal and a new trial.

¶ 61 Defendant asserts numerous other errors. We will address those contentions because the cumulative errors also require a new trial and because those issues are likely to recur on retrial. Defendant argues that he was prejudiced when the State introduced evidence of other crimes. Specifically, defendant complains that the court allowed evidence of the shooting, the recovery of cannabis and a gun during the November 2009 search of defendant's property, and defendant's incarceration on unrelated charges. Because the shooting was not other-crimes evidence, we will analyze that issue separately.

¶ 62 The court allowed the State to show that the shooting occurred, but it ruled that details of the shooting, particularly that police officers were occupants of the vehicle being shot at, were not admissible. The parties analyze this issue in terms of other-crimes evidence, but the State did not introduce details of the shooting for any purpose applicable to that theory. Other-crimes evidence is admissible to show the defendant's *modus operandi*, intent, identity, motive, or

absence of mistake. *People v. Wilson*, 214 Ill. 2d 127, 136 (2005). Other-crimes evidence may also be admitted to show, by similar acts or incidents, that the act in question was not done inadvertently, accidentally, involuntarily, or without guilty knowledge. *Wilson*, 214 Ill. 2d at 136. In a motion *in limine*, the State argued that the shooting was admissible to show knowledge, ownership, possession, identification, intent, motive, and absence of mistake. However, by its nature, other-crimes evidence means other crimes committed by the defendant. In our case, the State did not show that defendant was involved in the shooting, and the court explicitly found that defendant was not a co-conspirator in the shooting. Furthermore, the shooting was not in any way similar to the crime for which defendant was being tried.

¶ 63    The more accurate analysis is whether the shooting was relevant to prove any fact of consequence. Relevant evidence is that having any tendency to make the existence of any fact of consequence more or less probable than it would be without the evidence. *Smith v. Silver Cross Hospital*, 339 Ill. App. 3d 67, 73-74 (2003). All evidence must be relevant to be admissible. *Smith*, 339 Ill. App. 3d at 74. Determining relevance and admitting evidence are matters within the discretion of the trial court, and its ruling will not be reversed absent a clear abuse of discretion. *Smith*, 339 Ill. App. 3d at 74. Also, defendant moved *in limine* to bar evidence of the shooting, and he renewed the motion prior to Adams's testimony. A trial court has discretion whether to grant a motion *in limine*, and we will not reverse its ruling unless the court clearly abused its discretion. *People v. Hogan*, 388 Ill. App. 3d 885, 890 (2009).

¶ 64    The offense of being an armed habitual criminal has three elements: (1) the defendant receives, sells, possesses, or transfers (2) any firearm (3) after having been convicted a total of two or more times of a combination of any of the listed offenses. 720 ILCS 5/24-1.7(a) (West 2010). As noted above, defendant concedes elements 2 and 3. Therefore, defendant's receipt

and possession of the revolver were the facts "of consequence." The trial court ruled that defendant and Strickland were not co-conspirators in the shooting, but that they were co-conspirators in the concealment of the revolver that was used in the shooting. Defendant does not challenge that finding. Thus, the *fact* of the shooting is relevant to show that the revolver hidden under Quintana's stairs was the revolver that was used in the shooting. That the revolver was used in the shooting is relevant to corroborate Derrick Smith's testimony that he was present the next morning when Strickland gave defendant the gun and told him to get rid of it. However, we agree with defendant that the *details* of the shooting are irrelevant and prejudicial.[2]

¶ 65    On appeal, the State argues that details of the shooting were necessary to show the "continuing narrative." The "continuing narrative" is a component of the other-crimes doctrine. *People v. Carter*, 362 Ill. App. 3d 1180, 1189-90 (2006). When facts concerning uncharged criminal conduct are all part of a continuing narrative concerning the circumstances of the entire transaction, those facts do not concern separate, distinct, and unconnected crimes. *Carter*, 362 Ill. App. 3d at 1190. As the court explained in *Carter*, the "continuing narrative" may be necessary for the jury to understand the evidence. *Carter*, 362 Ill. App. 3d at 1190. As noted above, however, the details of the shooting did not constitute other-crimes evidence, because defendant was not involved in the shooting. The court specifically ruled against the State's position that defendant and Strickland were co-conspirators in the shooting. Therefore, the continuing-narrative exception is inapplicable. Moreover, Derrick Smith's testimony was fully comprehensible without the details of the shooting.

¶ 66    On retrial, Adams's testimony should be limited to: (1) shots were fired at a vehicle on July 13, 2009; (2) on July 14, 2009, Adams recovered three bullet fragments from the scene—

---

[2] The State does not argue that the improper admission of evidence was harmless error.

leaving out that the third bullet struck the backpack—and two bullet fragments were suitable for comparison; and (3) Adams submitted two of the bullet fragments to the crime laboratory. The photographs and verbal descriptions of the scene are not admissible. On retrial, Wallers will not be permitted to testify that there were three occupants of the vehicle and that he developed defendant as a suspect in the shooting. Wallers may not testify that defendant asked for an assistant State's Attorney or otherwise insinuate that defendant desired to make a deal, supposedly about his involvement in the shooting. Also, Wallers may testify that defendant initially denied knowledge of the revolver, but not that he denied knowledge of the shooting. Wallers may not testify to the details of defendant's second statement, in which he related to Wallers that a person said that they had shot at some Kings. Additionally, the State may not characterize the shooting as a "drive-by."

¶ 67    The evidence that defendant possessed cannabis and another gun and that he was incarcerated on unrelated crimes is other-crimes evidence. Evidence of other crimes is admissible if it is relevant for any purpose other than to show the defendant's propensity to commit crimes. *Wilson*, 214 Ill. 2d at 135. The admissibility of other-crimes evidence rests within the trial court's discretion, and its decision will not be disturbed absent an abuse of discretion. *Wilson*, 214 Ill. 2d at 135.

¶ 68    In a pretrial hearing, the State acknowledged that the other gun that the police found when executing the search warrant at defendant's house was not admissible. Nevertheless, the State's redirect examination of Stemmet consisted of a series of leading questions in which the State elicited that the police found cannabis and a gun. The State intimates, without explicitly arguing, that defense counsel opened the door to this evidence. In her cross-examination, defense counsel inquired whether the police search in cupboards and in hidden areas when

executing a search warrant. Her point was that such a thorough search did not yield the revolver. We do not believe that the cross-examination opened the door to what the police actually found. Evidence that they found another gun was highly prejudicial because of Stemmet's testimony that defendant admitted that he knew that he, as a convicted felon, could not possess a gun. The jury could have concluded that defendant's possession of the gun found during the search was sufficient to convict. The testimony that the police found cannabis was not related to the issue of defendant's possession of the revolver, and it was introduced solely as propensity evidence. Upon retrial, testimony about the discovery of the gun and the cannabis will not be admissible.

¶ 69    The State also introduced evidence of defendant's incarceration in the Kane County jail for crimes unrelated to the instant offense. Specifically, Shari Clark, a booking officer at the jail, testified to the jail's booking and fingerprinting procedures. She also testified that she fingerprinted defendant on November 19, 2009. Ryan Salisbury, a Kane County corrections officer, testified that he tried to take defendant to "intake" on February 11, 2011, but that defendant refused to go. Wallers testified that he attempted to talk to defendant at the Kane County jail on February 11, 2011, on an unrelated case, but that defendant would not speak with him, so Wallers left a warrant with the jail staff.

¶ 70    Clark's testimony was admissible to lay the foundation for the fingerprint examiner's testimony. Ostensibly, Salisbury's testimony corroborated Wallers's testimony that defendant refused to talk to Wallers on February 11, 2011. However, the February 11, 2011, incident clearly had no bearing on defendant's possession of the revolver. Wallers testified that he wanted to talk to defendant about an unrelated crime. Wallers's testimony that he left a warrant with jail personnel was simply a gratuitous effort to paint defendant as a bad person. Similarly,

Stemmet's testimony that, after executing the search warrant, police arrested defendant for an unrelated crime was irrelevant and prejudicial.

¶ 71    Defendant further contends that the court erred in admitting Julie Smith's hearsay testimony that her supervisor, Gina Mineti, verified defendant's partial thumb print on the garbage bag holding the revolver. Defense counsel objected without stating a basis, and neither the public defender nor private counsel included the error in the posttrial motions. Julie Smith's testimony that Mineti verified defendant's print was hearsay (see *People v. Smith*, 256 Ill. App. 3d 610, 615 (1994)) and is not admissible on retrial.

¶ 72                                   III. CONCLUSION

¶ 73    For the reasons stated, we reverse defendant's conviction and remand for a new trial.

¶ 74    Reversed and remanded.

¶ 75    JUSTICE BURKE, specially concurring.

¶ 76    I agree with the majority's analysis concerning the sufficiency of the evidence, as well as the decision to reverse and remand the case due to cumulative evidentiary errors. I part company with the majority on the *voir dire* issue.

¶ 77    Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) requires that the trial court ask each potential juror whether he or she understands and accepts the four *Zehr* principles. Defendant contends that the trial court failed to comply with Rule 431(b) during *voir dire*. Since defendant did not preserve this alleged error below, he requests that we review it under the plain-error doctrine. The first step in such an analysis is to determine whether clear and obvious error is present. *People v. Cohn*, 2014 IL App (3d) 120910, ¶ 26.

¶ 78    The majority finds error in the trial court's phrasing of the question posed to the venire after each *Zehr* principle was explained. Instead of asking whether the potential jurors

understood and accepted the principles, the court asked whether they had any "difficulty or disagreement" with them. This phrasing standing alone is certainly problematic, but I believe that we must examine the entire colloquy between the court and the venire to determine whether there was compliance with the rule. Here, the trial court stated,

> "Okay, Ladies and Gentlemen, earlier I touched upon some principles of law that apply to all criminal cases. I am going to explain to you certain principles, and if you understand the principles, agree with those principles and accept those principles, please do not raise your hand and that will signify that you understand, you agree and you accept these principles. *If you don't understand or accept these principles or don't agree with them, I would ask that you raise your hand in response to my question.*
>
> The defendant is presumed to be innocent of the charge against him. This presumption remains with the defendant throughout the trial and is not overcome unless, by your verdict, you find that the State has proven the defendant guilty beyond a reasonable doubt. Is there anyone who has any difficulty or disagreement with this proposition of law, the presumption of innocence? If so, raise your hand.
>
> The record reflects none.
>
> The State has the burden of proving the guilt of the defendant beyond a reasonable doubt. This burden remains upon the State throughout the trial. Does anyone have any difficulty or disagreement with this proposition of law, the burden of proof? If so, raise your hand.
>
> The record reflects none.

The defendant is not required to offer any evidence on his own behalf. Does anyone have any difficulty or disagreement with this principle of law. If so, please raise your hand.

The record reflects none.

If the defendant does not testify, it cannot be held against him. Does anyone have any difficulty or disagreement with this proposition of law, the right to remain silent? If so, please raise your hand.

The record reflects none." (Emphasis added.)

¶ 79 The trial court used the same procedure when impaneling the alternate jurors. When addressing all potential jurors, the court clearly instructed them to raise their hands if they did not understand or accept the principles or if they did not agree with them. After each principle was explained, the court asked if any potential jurors had any difficulty or disagreement with it. In light of the instructions, "difficulty" referred to whether a potential juror had difficulty understanding or accepting the principle.

¶ 80 Had the trial court used the best practice of simply parroting the language of the rule in its questions, this issue never would have arisen on review. That said, the potential jurors sitting through this *voir dire* would have known that they should raise hands if they did not understand, accept, or agree with each *Zehr* principle.