2020 IL App (2d) 170942-U
No. 2-17-0942
Order filed April 7, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| VILLAGE OF ROUND LAKE, | ) | Appeal from the Circuit Court |
| | ) | of Lake County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | 16 DT 1534 |
| | ) | |
| KATIE MILROY, | ) | Honorable |
| | ) | John J. Scully |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Justices Jorgensen and Schostok concurred in the judgment.

**ORDER**

¶ 1   *Held*: The appellate court affirmed defendant's conviction for driving under the influence of alcohol where (1) there was sufficient evidence to find her guilty beyond a reasonable doubt, (2) defendant's procedural default of the *Zehr* issue was honored because she failed to meet her burden of persuasion that this was a closely balanced case under the plain-error doctrine, and (3) defendant was not denied a fair trial by the admission of evidence, prosecutorial comments, or a jury instruction.

¶ 2    Defendant, Katie M. Milroy, appeals her conviction of driving under the influence of alcohol (625 ILCS 5/11-501(a)(2) (West 2016)) following a jury trial in the circuit court of Lake County.   We affirm.

¶ 3                    I. BACKGROUND

¶ 4    Defendant was charged by complaint with driving under the influence, and a jury trial took place over two days from May 2-3, 2017.   Officer Kurtis Schultz of the Round Lake Police Department testified at trial that he was on patrol in the early morning hours of August 29, 2016. Just after midnight, he observed a silver Grand Am driving with only one working headlight. Schultz turned his patrol car around and began following the car.   He testified that he observed the car "weaving back and forth within its lane."   Based upon the non-working headlight, Schultz activated his overhead lights to initiate a traffic stop.   The car was approaching a railroad crossing when Schultz activated his lights, and it did not immediately stop.   The car continued across the railroad crossing, came to a stop at the next intersection, executed a right turn using its turn signal, and then pulled over and parked on the shoulder of Route 134.

¶ 5    Defendant was in the driver's seat, and a male passenger was in the front seat next to her. When Schultz asked defendant for her driver's license and insurance papers, she reached into the back seat more than once and came back empty-handed each time.   Defendant told Schultz that she left her driver's license at home when she left to pick up her friend from a nearby bar.   Schultz described defendant's speech as "confused," and said that he smelled a strong odor of alcohol from inside the car, though he could not be certain if the smell was emanating from defendant, her passenger, or both.   Defendant told Schultz that she had nothing to drink, and she provided Schultz with sufficient information for him to confirm who she was and that she had a valid driver's license.

¶ 6    After verifying her license, Schultz asked defendant to step out of her car and come to the rear of the vehicle.   He testified that, once defendant was outside of the car, he detected a strong odor of alcohol on her breath, and her eyes were "glassy and bloodshot."   Schultz administered several field sobriety tests, beginning with a Horizontal Gaze Nystagmus test (HGN), where he

instructed defendant to follow his finger with her eyes. Schultz observed a "lack of smooth pursuit in both eyes" and "nystagmus" in both eyes, which is an involuntary jerking of the eye. Schultz observed six of six possible indicators for alcohol consumption during the HGN test.

¶ 7 Schultz next administered the "walk-and-turn" test. He instructed defendant to take nine heel-to-toe steps in a straight line, turn around, and then take nine more heel-to-toe steps along the same line. Schultz could not recall whether he used an actual painted line for the test or whether he instructed defendant to walk on an "imaginary" line. Schultz testified that he observed defendant lose her balance during the initial instruction phase, start the test before being instructed to do so, and step off of the line multiple times while performing the test. In all, Schultz observed three deficient "decision points," which indicated that defendant failed the walk-and-turn test.

¶ 8 Schultz then asked defendant to perform the "one-legged stand" test. He instructed defendant to pick up either her left or right foot six inches off of the ground and count out loud in the manner "one-thousand one, one-thousand two, one-thousand three for 30 seconds." During the test, Schultz granted defendant's request to remove her shoes. Schultz observed defendant put her foot down multiple times, raise her arms to keep her balance, and sway, which were deficiencies in three of four decision points, and "a good indicator of somebody who's under the influence of alcohol."

¶ 9 Schultz placed defendant under arrest. After Schultz arranged a ride home for defendant's passenger, he transported her to the booking facility in Round Lake. Schultz testified that he detected a strong odor of alcohol coming from the backseat, where defendant was seated, during the five-minute drive.

¶ 10 Schultz described defendant's mood at the booking facility as "erratic." Schultz testified that she went from a "calm, normal state to agitated state quickly, sometimes yelling, sometimes

not," while using profanity. He continued to detect the odor of alcohol coming from her at the booking facility. He testified that it was "very evident" under the lights in the booking room that her eyes were glassy and bloodshot. Schultz described a still picture from the booking video in which defendant was "[g]iving me the bird," meaning that she was extending the middle fingers of both of her raised hands in his direction. Schultz testified that, based on his five years of experience and training as a law enforcement officer, and based on his life experience, it was his opinion that defendant was under the influence of alcohol.

¶ 11 On cross-examination, Schultz testified that he did not recall whether he made mention of defendant's glassy or bloodshot eyes in his police report. Schultz confirmed that defendant was not slurring her speech on the night of her arrest.

¶ 12 Two videos were entered into evidence and shown to the jury during Schultz's testimony. The first was a video taken from Schultz's "dash-cam" in his squad car, which included audio of the entire roadside encounter and the transport of defendant to the booking facility. The video shows defendant's car passing Schultz's squad car in the opposite direction while Schultz was parked on the side of Cedar Lake Road. Schultz immediately turned his car around and traveled in the same direction as defendant's car. Schultz quickly caught up to defendant's car and followed her for about 30 seconds before activating his overhead lights. During that time, the dash-cam video showed defendant's car veering to the left within its lane and then back to the center of the lane. The video also showed defendant's car approaching the outer boundary of a railroad crossing when Schultz activated his lights. Defendant continued through the railroad crossing and came to a stop at the intersection on the other side of the crossing. Utilizing her turn signal, defendant made a right turn onto Route 134 and pulled over to the shoulder. Schultz pulled in behind her.

¶ 13    The dash-cam video showed Schultz approaching defendant's car and asking her for her driver's license and proof of insurance.   Defendant cannot be seen at this stage, but she can be heard telling Schultz that she did not have her driver's license, explaining that she was giving her friend a ride home from a local bar and that she left her purse at home.   Defendant could be heard on the video telling Schultz that she had not had anything to drink.

¶ 14    The dash-cam video showed Schultz leaving defendant in her car while he went to his squad car to verify her identity and driver's license.   When Schultz returned to defendant's car, he asked her to step out and walk to the rear of her car.   She complied with no apparent difficulty, again telling Schultz that she had nothing to drink.   Schultz began the sobriety field tests, starting with the HGN test.   Once completed, Schultz told defendant that her eyes indicated that she was impaired.   Defendant responded that her eyes were very dry.   During the walk-and-turn test, defendant could be seen walking nine steps in both directions along an "imaginary" line.   During the one-legged-stand test, defendant's raised foot could clearly be seen touching the ground six times while her arms were raised.   When her raised foot touched the ground for the fourth time, defendant asked Schultz if she could remove her shoes, and he permitted her to do so.   The test ended shortly thereafter.

¶ 15    Schultz told defendant that she failed each of the field sobriety tests and he placed her under arrest.   Defendant, who had been polite and compliant to this point, became upset when she learned that she was being arrested, complaining that she would not be able to work or take care of her daughter if she were arrested.   Defendant told Schultz: "My lawyer is going to bury you. You should've let me go home."

¶ 16    Schultz placed her in the back of his squad car, and left her there while he and other officers attended to defendant's passenger, who was ultimately given a ride home by officers.   While

waiting for Schultz to return to the squad car, defendant could be heard on the dash-cam video screaming: "Are you f***ing kidding me!    What the f*** is taking so long!"

¶ 17    The second video shown to the jury depicted the procedures at the booking facility following defendant's arrest.    During the booking video, defendant's demeanor and behavior shifted randomly over the course of the hour.    At times, she was respectful and cooperative.    She thanked an officer for retrieving her keys from her car, and she later calmly considered whether she should consent to blood-alcohol testing, before she ultimately refused to consent.

¶ 18    At other times, she appeared sad, burying her head into her lap and lamenting about how this arrest would affect her.    On one occasion, when an officer asked her the name of her passenger, defendant giggled and spoke in a high-pitched voice:

> "I'm not telling you anything. [laughter] Why the f*** would I? Serious? Yeah, no. [laughter] Bye. [waives hand and laughs] Nice try. [laughter] That was, that was really cute, though, honestly—really cute. [loud laughter] Bye!"

Defendant cursed frequently, telling Schultz that he did not "give a flying f***" about her situation, and later raising the middle fingers of both of her hands toward Schultz.    She told Schultz that she hoped that he "burn[s] in hell."    She asked Schultz if he would pay the impound fee for her car.    When he responded that he would not, the following exchange took place:

"Defendant:    Then how the f*** am I going to get my car out?

Schultz:    I don't know.    I'm not the one who drank and drove tonight.

Defendant:    I didn't drink and drive.    You're an asshole.    You gave me a DUI when you didn't have to.

Schultz:    You still smell like alcohol.

Defendant:    And you smell like an asshole."

¶ 19    Following Schultz's testimony, the Village of Round Lake (Village) rested.    Defendant also rested without presenting evidence, and the court recessed for the day.

¶ 20    The next morning, the court stated that it had met informally with the parties the previous evening to discuss jury instructions.    The court then went through each of the proposed jury instructions, including Illinois Pattern Jury Instructions, Criminal No. 23.29 (4th ed. 2000) (hereinafter IPI Criminal No. 23.29), which provides:

> "A person is under the influence of alcohol when, as a result of drinking any amount of alcohol, his mental or physical faculties are so impaired as to reduce his ability to think and act with ordinary care."

IPI Criminal No. 23.29 was given without objection.

¶ 21    During closing argument, the Village argued that a sober person in the same position as defendant would not have acted in the same manner as she did on the night of her arrest.    The prosecutor described defendant's behavior as a "completely inappropriate, disproportionate reaction to the situation she was in."    The prosecutor additionally argued:    "Consider what the defendant's behavior and what her statements to the officer were, consider if that is someone who is credible and sober."    These arguments mirrored comments from the prosecutor's opening statement, where he told the jury that they would see evidence of her guilt in her "vulgar words towards the officer" that were "completely inappropriate to the situation."    In his rebuttal argument, the prosecutor told jurors that they could find defendant guilty "if the alcohol affected her ability to think and act with ordinary care."

¶ 22    At 10:23 a.m. on May 3, 2017, the jury retired to consider their verdict.    At 11:53 a.m., the jury returned a guilty verdict.    Defendant timely appealed.

¶ 23                                        II. ANALYSIS

¶ 24    Defendant raises three main issues on appeal:   (1) the evidence was insufficient to prove her guilty beyond a reasonable doubt, (2) the court's failure to properly question potential jurors on the *Zehr* principles was plain error, and (3) she was denied her right to a fair trial by (a) the erroneous admission of the booking video into evidence, (b) improper comments during opening statement and closing argument by the prosecutor, (c) an improper jury instruction, and (d) cumulative error.   The Village responds that (1) the evidence was sufficient to establish defendant's guilt beyond a reasonable doubt, (2) there was no plain error because the case was not closely balanced, and (3) neither the booking video, statements by the prosecutor, nor the jury instruction infringed upon defendant's right to a fair trial.

¶ 25                    A. Sufficiency of the Evidence

¶ 26    Defendant maintains that the Village failed to prove beyond a reasonable doubt that she was driving while under the influence of alcohol, arguing that (1) the evidence showed that she drove safely, (2) the field sobriety tests were improperly administered, and (3) Schultz exaggerated the results of the field sobriety tests.   The Village responds that the evidence clearly and objectively supports the guilty verdict.

¶ 27    When a defendant challenges the sufficiency of the evidence presented against her, the reviewing court must determine whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt.   *People v. Harris*, 2018 IL 121932, ¶ 26.   It is the jury's role to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the facts.   *Harris*, 2018 IL 121932, ¶ 26.   It is not the function of the reviewing court to retry the defendant, and it must draw *all* reasonable inferences in favor of the prosecution.   *Harris*, 2018 IL 121932, ¶ 26.   We will not reverse a conviction on appeal for insufficient evidence unless the

evidence is so improbable or unsatisfactory that reasonable doubt as to defendant's guilt remains. *Harris*, 2018 IL 121932, ¶ 26.

¶ 28 Defendant argues that her driving was safe and legal because she stayed within the speed limit, did not swerve between lanes, properly used her turn signal, appropriately parked on the shoulder of the road, and did not crash her car. She additionally argues that she denied using any alcohol, was polite and compliant up until the time of her arrest, had clear speech, had no trouble getting out of her car, did not hold onto the car, did not stumble or stagger while walking, and gave Schultz her social security number from memory. Defendant concludes that, even if the Village established that she "may have used alcohol," all of these factors indicate that the Village did not prove that she was under the influence of alcohol such that she could not safely operate a vehicle.

¶ 29 According to defendant, the *only* evidence of her intoxication was Schultz's testimony, which was not credible where he could not recall whether (1) he wrote that defendant had glassy eyes in his police report, (2) the National Highway Transportation Safety Administration requires the use of an actual straight line during the walk-and-turn test, or (3) he gave defendant the HGN instruction to keep following his finger with her eyes until told to stop. Defendant further asserts that Schultz's testimony was "largely contradictory" and that his "unqualified opinion" that she failed the sobriety tests did not demonstrate that she could not safely drive. According to defendant, Schultz exaggerated her deficient performance on the sobriety tests, as the dash-cam video showed that her performance was "only slightly deficient under the circumstances." Moreover, the booking video was irrelevant as to whether she was intoxicated because it was reasonable for her to be agitated after she was arrested. Finally, even had she taken the blood-alcohol test, it would not have proved or disproved that she was under the influence of alcohol, because it does not measure her ability to drive safely. For all of these reasons, defendant argues

that the evidence was insufficient to prove that she was under the influence such that she was incapable of driving safely.

¶ 30     To sustain a conviction for driving under the influence of alcohol, the Village had to prove that defendant was (1) driving or in physical control of her car, and (2) under the influence of alcohol.    625 ILCS 5/11-501(a)(2) (West 2016).    Defendant concedes that she was driving, and thus, the only issue before us is whether she was under the influence of alcohol.    A person is "under the influence of alcohol" when he or she is " 'under the influence to a degree that renders the driver incapable of driving safely.' "    *People v. Phillips*, 2015 IL App (1st) 131147, ¶ 18 (quoting *People v. Love*, 2013 IL App (3d) 120113, ¶ 34).    Circumstantial evidence may be used to prove that a person is under the influence, and the testimony of a single, credible police officer is sufficient to sustain a conviction for driving under the influence of alcohol.    *Phillips*, 2015 IL App (1st) 131147, ¶ 18.

¶ 31     Here, Schultz testified that defendant swerved within her lane, was slow to react to his lights, and seemed confused when answering his questions.    Despite defendant's repeated denials that she had consumed any amount of alcohol, Schultz testified that he detected a strong odor of alcohol coming from defendant during the field sobriety tests, while transporting her in his squad car, and during the booking process.    Schultz further testified that defendant's eyes appeared glossy and bloodshot, and that she failed each of the three field sobriety tests.    Schultz described defendant's behavior during the booking process as "erratic," going from calm to agitated very quickly, yelling and using profanity.    It was Schultz's opinion, based on his training and experience in five years as a law enforcement officer, as well as his personal life experience, that defendant was under the influence of alcohol.

¶ 32    The video evidence corroborated Schultz's testimony.   Defendant's car is seen veering to the left and back within her lane.   Defendant carried no identification while driving, told Schultz that she was coming from a bar, and denied drinking any alcohol whatsoever.   During a test designed to assess her ability to maintain balance, defendant's foot is seen dropping to the ground six times in 30 seconds.   Defendant told Schultz that her lawyer would "bury" him, and she screamed obscenities from the backseat of the squad car.

¶ 33    Defendant's random shifts in demeanor are evident in the booking video.   She inexplicably laughs at an officer who asked the name of her passenger.   She sobs.   She repeatedly berates Schultz, using the F-word over and over again, giving him the "bird" with both fingers, telling him that she wished he would "burn in hell," and retorting that he "smell[ed] like an asshole."   Defendant continued to deny consuming any alcohol, but she nonetheless refused to submit to testing to determine her blood-alcohol content, which was itself circumstantial evidence of her consciousness of guilt.   *People v. Johnson*, 218 Ill. 2d 125, 140 (2005) (evidence of a person's refusal to take a blood-alcohol test is admissible and may be used to argue the defendant's consciousness of guilt).

¶ 34    Where defendant and the Village presented competing theories of what the evidence demonstrated, it was for the jury to assess each of these issues, weigh the testimony, resolve conflicts in the evidence, and draw reasonable inferences from that evidence.   *Village of Bull Valley v. Winterpacht*, 2012 IL App (2d) 101192, ¶ 12.   Schultz's testimony, combined with the dash-cam and booking videos, presented the jury with sufficient evidence to establish a basis on which it could reasonably infer that defendant was not only drinking, but that she was under the influence of alcohol such that she could not safely operate a motor vehicle.   See *People v. Hill*,

2014 IL App (2d) 120506, ¶ 56.   Therefore, we conclude that the evidence was sufficient to prove defendant's guilt beyond a reasonable doubt.

¶ 35                    B. Rule 431(b)/*Zehr* Principles

¶ 36    Defendant argues that she was denied a fair trial because the trial court violated Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) by failing to ask potential jurors during *voir dire* whether they understood and accepted the "*Zehr*" principles.   Rule 431(b) codified the principles laid out in *People v. Zehr*, 103 Ill. 2d 472, 477-78 (1984), and provides in relevant part:

> "The court shall ask each potential juror, individually or in a group, whether that juror *understands and accepts* the following principles:   (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her behalf; and (4) that if a defendant does not testify it cannot be held against him or her ***."   (Emphasis added.) Ill. S. Ct. R. 431(b) (eff. July 1, 2012).

Defendant asserts that the trial court erred by asking the jurors whether they "have a problem" with any of the principles, rather than if they "understand" and "accept" each principle.

¶ 37    Defendant acknowledges that this issue was not preserved, but argues that we should review it under the plain-error doctrine.   The plain-error doctrine permits appellate review of a clear or obvious unpreserved error when (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) when the error was so serious as to threaten the integrity of the judicial process, regardless of the closeness of the evidence.   (Internal quotation marks omitted.)   *People v. Sebby*, 2017 IL 119445, ¶ 48.   Absent evidence that the error produced a biased jury, which is not alleged

in this case, a Rule 431(b) violation is not cognizable under the second prong of the plain-error doctrine. *Sebby*, 2017 IL 119445, ¶ 52. Therefore, to prevail on her plain-error argument, defendant must demonstrate under the first prong of the plain-error doctrine that there was error and that the case was closely balanced. We conduct a *de novo* review of alleged violations of Rule 431(b). *People v. Wilmington*, 2013 IL 112938, ¶ 26.

¶ 38 The Village concedes that the court did not strictly comply with Rule 431(b), but argues that even if this was error, this case was not closely balanced, so there can be no plain error.

¶ 39 During *voir dire*, the trial court questioned potential jurors on the *Zehr* principles as follows:

> "I'm going to give you a couple of concepts, and I want to see if any of you have a problem with the concept. Do you accept and understand the following principle that a defendant is presumed innocent of the charges against her? Do any of you *have a problem* with that concept? No one is raising their hand.
>
> ***
>
> Before a defendant can be convicted, the State must prove the defendant guilty beyond a reasonable doubt. Do any of you *have a problem* with that concept? No one is raising their hand.
>
> How about the concept the defendant is not required to offer any evidence on her own behalf? Any of you *have a problem* with that concept? And no one is raising their hand.
>
> And do any of you *have the problem* that the defendant's failure to testify cannot be held against her? Do any of you *have a problem* with that concept? And no one is raising their hand." (Emphasis added.)

¶ 40    The first step in any plain-error analysis is to determine whether there was clear error. *Sebby*, 2017 IL 119445, ¶ 49.    In *Sebby*, our supreme court determined that it was clear error for the trial court to ask potential jurors whether they "had any problems with" the *Zehr* principles, rather than asking them whether they "understood" and "accepted" each of those principles. *Sebby*, 2017 IL 119445, ¶ 49.    Here, the trial court asked potential jurors if they "have a problem" with the various principles, which was virtually identical to the question asked by the trial court in *Sebby*.    This was a clear violation of Rule 431(b).    Trial courts must take notice of this important rule and employ all necessary steps to ensure full compliance in every criminal case tried before a jury.   *People v. Thompson*, 238 Ill. 2d 598, 616 (2010).    "Had the trial court used the best practice of simply parroting the language of the rule in its questions, this issue never would have arisen on review."   *People v. Dismuke*, 2017 IL App (2d) 141203, ¶ 80 (Burke, J., specially concurring).

¶ 41    Because we determine that there was clear error, the only question remaining in this first-prong plain-error case is whether the evidence is closely balanced.   *Sebby*, 2017 IL 119445, ¶ 69. "Whether the evidence is closely balanced is, of course, a separate question from whether the evidence is sufficient to sustain a conviction on review against a reasonable doubt challenge." *People v. Piatkowski*, 225 Ill. 2d 551, 566 (2007).   For inquiries regarding the closeness of the evidence, we conduct a qualitative, commonsense assessment of the totality of the evidence within the context of the case, looking at the evidence on the elements of the charged offense along with any evidence regarding the witness' credibility.   *Sebby*, 2017 IL 119445, ¶ 53.   The evidence may be closely balanced even when the defendant presents no evidence whatsoever in his or her case-in-chief.   *Piatkowski*, 225 Ill. 2d at 567.

¶ 42    As detailed above, defendant concedes that she was driving, and the only element at issue is whether defendant was under the influence of alcohol.   The Village proved its case through the

testimony of Schultz and the two videos. Schultz had ample opportunity to observe defendant, spending two hours in close proximity to her during the morning of her arrest. He testified that she swerved within her lane while driving and delayed in reacting to his lights, although he initiated the traffic stop on the basis of her non-working headlight. Defendant told Schultz that she was coming from a bar, was unable to produce identification, and seemed "a bit confused." Schultz further testified that defendant had bloodshot eyes, smelled strongly of alcohol, and that she failed each of three field sobriety tests. Schultz described defendant's demeanor as "erratic," saying that she quickly shifted between calm and agitated states, sometimes yelling and using profanity.

¶ 43 The dash-cam and booking videos confirmed Schultz's testimony. Defendant's car swerved to the left within her lane while driving. After she was stopped, defendant could be heard telling Schultz that she left her identification at home and that she was coming from a bar. During the one-legged stand test, she dropped her foot to the ground six times, even while she used her arms to enhance her balance. The random swings in her demeanor were evident in the videos, as was her repeated use of profanity.

¶ 44 Defendant frames this as a closely balanced credibility contest between two competing theories. She asserts that she merely picked up her friend from a local bar and forgot her identification at home. She argues that Schultz exaggerated her deficient performance during the sobriety tests, and that her profane and ill-mannered behavior is explained by the fact that she was upset about being arrested, and that her poor behavior did nothing to prove that she was under the influence of alcohol. Thus, defendant concludes that neither the dash-cam nor the booking video did anything to "corroborate" or "contradict" either theory of the case.

¶ 45 Defendant compares this case to *People v. Naylor*, 229 Ill. 2d 584 (2008), arguing that it "boiled down to a credibility contest between the defense theory and the Village's theory." In

*Naylor*, two officers testified that the defendant sold them heroin, whereas the defendant testified that he was mistakenly swept up in a drug raid while picking up his son from school. *Naylor*, 229 Ill. 2d at 607. Our supreme court determined that the evidence was closely balanced because both sides offered testimony supporting different plausible versions of events and there was no extrinsic evidence that corroborated or contradicted either version. *Naylor*, 229 Ill. 2d at 607. Our case is clearly distinguishable from *Naylor*. Here, there was no credibility contest because Schultz was the only witness to testify at trial. Moreover, the dash-cam and booking videos were extrinsic evidence that corroborated Schultz's testimony. While defendant offers an alternative theory, this was not a credibility contest of the type discussed in *Naylor*, and this case was not closely balanced based on that theory.

¶ 46 Defendant further argues that the jury's request to review the dash-cam video during deliberations indicates that this was a closely balanced case, citing *People v. Lee*, 2019 IL App (1st) 162563, ¶ 67. The *Lee* court held that the evidence was closely balanced in part because the jury sent four notes to the court during its two days of deliberations indicating that it was at an impasse. *Lee*, 2019 IL App (1st) 162563, ¶ 71. Here, the jury retired to begin its deliberations at 10:23 a.m. Fourteen minutes later, at 10:37 a.m. the jury sent a note to the court: "We would like to see the dash cam video of sobriety tests." The jury was shown the video without objection. At 11:25 a.m., the court went back on the record and said that it had received another note from the jury, which read: "We would like to see driving video footage again until she stops." The jury was shown that portion of the video without objection. At 11:50 a.m., the court informed the parties that the jury had reached a verdict. There is no indication in the record that the jury ever reached an impasse or that the jurors themselves considered this a close case. The notes indicated only that the jury wished to review evidence, and careful consideration of the evidence is what we

expect of jurors in any trial. *Wilmington*, 2013 IL 112938, ¶ 35. The jury deliberations took only one hour and 27 minutes from start to finish and were in no way extraordinary. Thus, this case is distinguishable from *Lee* and is not closely balanced based on the jury's request to review evidence.

¶ 47 Defendant has failed to meet her burden of persuasion that this was a closely balanced case under the first prong of the plain-error analysis. *Naylor*, 229 Ill. 2d at 593. Consequently, we must honor her procedural default of the *Zehr* issue. *Naylor*, 229 Ill. 2d at 593.

¶ 48                                         C. Fair Trial

¶ 49 Defendant raises four additional issues under the broad heading that she was denied a fair trial. She argues that the trial court deprived her of a fair trial because (1) it abused its discretion by admitting the booking video, (2) the prosecutor made improper comments during his opening statement and closing argument, (3) the court erroneously gave IPI Criminal No. 23.29, and (4) the cumulative impact of these errors deprived defendant of a fair trial. The Village responds that (1) the booking video was probative as to whether defendant was under the influence of alcohol, (2) it made no improper comments that unfairly prejudiced defendant, and (3) the court properly gave the relevant jury instruction.

¶ 50                               1. *Admission of Booking Video*

¶ 51 Evidence is relevant and may be admitted at trial when it tends to prove or disprove any material fact at issue. *People v. Hoerer*, 375 Ill. App. 3d 148, 157 (2007). Even relevant evidence, however, may be excluded if its prejudicial effect substantially outweighs its probative value. *Hoerer*, 375 Ill. App 3d at 157. It is within the sound discretion of the trial court to determine whether evidence is relevant and whether its probative value outweighs its prejudicial impact, and such a decision will not be reversed absent an abuse of that discretion. *People v.*

*Tolbert*, 323 Ill. App. 3d 793, 797 (2001). An abuse of discretion occurs only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court. *Tolbert*, 323 Ill. App. 3d at 797.

¶ 52 Defendant argues that the booking video showed only that "she was frustrated at the situation," and thus, because there was no evidence to connect her behavior seen in the video to her ability to safely drive a vehicle, the video is irrelevant as to whether she was under the influence of alcohol. In her reply brief, defendant adds that the Village introduced no evidence to demonstrate her "normal" behavior, and thus, did not prove that she was intoxicated because this might be the way she behaves in her daily life. Defendant further asserts that, while the video was irrelevant as to her guilt, it was nonetheless highly prejudicial because it was used to show that she was "erratic," "moody," and generally deserving of punishment.

¶ 53 To be relevant, the booking video needed only to tend to prove or disprove that defendant was under the influence of alcohol, which was the only element at issue. Defendant displayed shifts in her demeanor and behavior that could reasonably be inferred to be the result of intoxication. See *People v. Sturgess*, 364 Ill. App. 3d 107, 110 (2006) (affirming driving under the influence conviction when the arresting officer testified that he determined the defendant was under the influence based on her "demeanor, comportment, and behavior"). Moreover, the video showed her refusal to submit to a breath test, which is itself relevant to demonstrate her consciousness of guilt. *Johnson*, 218 Ill. 2d at 140. Accordingly, we determine that the booking video was relevant because it tended to prove a material fact at issue, whether defendant was under the influence of alcohol.

¶ 54 Despite its relevance, the booking video might have been inadmissible if its prejudicial impact substantially outweighed its probative value. *Hoerer*, 375 Ill. App 3d at 157.

Defendant's argument on this point is that she was improperly prejudiced because the Village used her own bad behavior in the video to demonstrate that she had a general propensity to commit crime. In support, she cites *People v. McGee*, 2015 IL App (1st) 122000, ¶ 25 ("Evidence of a crime or other bad acts for which a defendant is not on trial is inadmissible if relevant merely to establish the defendant's propensity to commit crime."). Defendant's behavior and choice of words may have had a negative impact on the jury's view of her theory that she was a "rational sober person," but this evidence was also relevant to prove she was under the influence of alcohol. Therefore, the video went directly to an element of the crime charged and was not introduced merely to establish defendant's general propensity to commit crime. Under these circumstances, where the video evidence corroborated witness testimony and tended to show that defendant was under the influence of alcohol, we cannot say that its prejudicial impact substantially outweighed its probative value. Therefore, the court did not abuse its discretion by admitting the booking video.

¶ 55                                2. *Prosecutorial Comments*

¶ 56    Defendant next asks us to review the unpreserved issue of what she believes were improper comments by the prosecution during its opening statement, closing argument, and rebuttal argument. Defendant asserts we should review these comments under both prongs of the plain-error doctrine because the case was closely balanced and the errors were serious.

¶ 57    As noted, the first step in a plain-error analysis is to determine whether there was error at all. *Sebby*, 2017 IL 119445, ¶ 49. Defendant first complains that the prosecutor inappropriately described her language in the booking video as "vulgar" and "inappropriate" during his opening statement. With respect to these comments, defendant asserts that the prosecutor used the video as an improper attack on her character for no reason other than to prejudice her.

¶ 58    The purpose of an opening statement is to allow a party to remark generally and concisely about the facts and issues, and the State is generally given wide latitude in discussing the case. *People v. Smith*, 2017 IL App (1st) 143728, ¶ 48.    However, comments that are intended only to arouse the prejudice and passion of the jury are improper.    *Smith*, 2017 IL App (1st) 143728, ¶ 48.    The comments defendant finds objectionable are contained in the following passage:

> "And you'll see some of the booking video again from the police station with the defendant's interaction with Officer Schultz.    In addition to giving her the opportunity to take a breathalyzer test and her refusing to take that test, which you consider later, is further evidence of her guilt that you'll see in further detail, her behavior and her language, her *vulgar words* towards the officer, her completely out of character or out of—all the angles of the situation, *it's completely inappropriate to the situation*.    She laughs alternately. She cries.    She buries her head in her hands, continues swearing at the officers in the room." (Emphasis added.)

The prosecutor described what the jury would see on the booking video, which was relevant to whether defendant was under the influence of alcohol.    He accurately stated that the jury would observe her interactions with Schultz and her refusal to take the blood-alcohol test.    Considering defendant's frequent use of the F-word, her use of her middle fingers, her wishing that Schultz would burn in hell, and her telling Schultz that he smelled like an asshole, the prosecutor fairly, accurately, and objectively summarized defendant's words as "vulgar" and "inappropriate to the situation."    Moreover, the prosecutor was not raising defendant's character as an issue.    Instead, he discussed these facts as evidence that would point to defendant being under the influence of alcohol, the central issue in the case.    Accordingly, the comments were not an attack on defendant's character and were entirely proper.

¶ 59    Defendant next argues that the prosecutor continued to make improper remarks during his closing argument when he argued that defendant's behavior in the booking video was a "completely inappropriate, disproportionate reaction to the situation that she was in," and urged the jury to strongly consider her character and behavior.

¶ 60    Similar to opening statements, prosecutors are afforded wide latitude during closing arguments.  *People v. Blue*, 189 Ill. 2d 99, 127 (2000).   Prosecutors may comment on the evidence and all reasonable inferences to be made therefrom, though they may not present arguments that serve no purpose but to inflame the passions of the jury.   *Blue*, 189 Ill. 2d at 127-28.   Closing arguments are viewed in their entirety and allegedly erroneous statements must be viewed in context.   *Blue*, 189 Ill. 2d at 128.   The comments defendant alleges were error came within the following passages:

> "You saw her begin to alternately scream and yell, sobbing, yelling at the officer. Right before she's taken to the police station, you heard "What the fuck is taking so long?" And "Are you fucking kidding me?"   Now, does that sound like something that someone would say if they're completely sober and in the position that she was in?   I don't think it is.
>
> And later, back at the police station, you see further evidence of this *completely inappropriate, disproportionate reaction to the situation she was in*.
>
> ***
>
> Now, again, you have seen the video.   She goes from slumping in her chair to sitting up straight, to putting her feet up on the desk, to burying her head in her legs, to giggling really oddly at several times.   She sort of giggles when the female officer walks in the room and waving at her and speaking in a childish tone of voice.   And at other

points, again using vulgarity, dropping "F" bombs on the officer.   At one point telling him she hopes he burns in hell.   Again, I don't know how someone in a sober state of mind would ever consider that *appropriate*, and given what else you know here, I think it's further evidence of her intoxication.

***

And again, one of the other things we'll ask you to do today is consider the credibility, not only of the witnesses you heard on the stand, but also what you see and hear on the videos.   *Consider what the defendant's behavior and what her statements to the officer were, consider if that is someone who is credible and sober*." (Emphasis added.) Defendant additionally complains of comments during the Village's rebuttal argument, where the prosecutor quoted language from IPI Criminal No. 23.29 and told the jury that if alcohol affected defendant's ability "to think and act with ordinary care, you can find her guilty."   She argues that the comments during the closing and rebuttal arguments implied to the jury that "consumption equals automatic intoxication" and that her guilt can be based upon "inappropriate" behavior.

¶ 61    Viewed in their entirety within the context of this case, the prosecutor's comments properly invited the jury to draw reasonable inferences from defendant's words and behavior seen on the video.   The Village's theory was that defendant's words and behavior told a different story than her repeated denials of drinking alcohol.   There is nothing in the comments that urged the jury to consider defendant's general character, inferred that consumption equals intoxication, or conveyed that the jury could find her guilty based solely on her bad behavior.   The comments went directly to the element of the crime at issue.   As such, the comments were not error and there can be no plain error.

¶ 62                                   3. *Jury Instruction*

¶ 63    Defendant's next unpreserved issue is that the trial court erred by giving IPI Criminal No. 23.29, because it did not accurately state the law as to whether she was under the influence of alcohol.   Defendant again acknowledges that she did not preserve this issue for review, but argues that we should review it under both prongs of the plain-error doctrine.   As noted above, there can be no plain error if there was no error, and the Village responds that there was no error in this instance.   Citing *People v. Dorn*, 378 Ill. App. 3d 693, 698 (2008), defendant asserts that we should review this issue *de novo* because we are determining whether the instruction accurately conveyed the applicable law.   Defendant misstates the holding of *Dorn*, which was that we conduct a *de novo* review of whether jury instructions, "*as a whole*," accurately convey the law. (Emphasis added.)   *Dorn*, 378 Ill. App. 3d at 698.   "However, we review for an abuse of discretion the trial court's decision to give a particular jury instruction."   *Dorn*, 378 Ill. App. 3d at 698.   Thus, in determining whether there was error to support defendant's plain-error argument, we review the trial court's decision to give this particular jury instruction for an abuse of discretion.

¶ 64    IPI Criminal No. 23.29 provides:

> "A person is under the influence of alcohol when, as a result of drinking any amount of alcohol, his mental or physical faculties are so impaired as to reduce his ability to think and act with ordinary care."

Defendant contends that IPI Criminal No. 23.29 failed to require the jury to make a specific finding as to whether she was under the influence of alcohol such that she could not safely operate a vehicle.   Defendant additionally contends that the instruction erroneously invited the jury to consider her "general character, behavior, and conduct," in addition to her ability to drive.

¶ 65    IPI Criminal No. 23.29 is a well-established pattern instruction that defines, as a matter of law, when a person is under the influence of alcohol.   See IPI Criminal No. 23.29 (4th ed. 2000),

Committee Comments. The committee comments to IPI Criminal No. 23.29 cite *People v. Schneider*, 362 Ill. 478 (1936), which laid the foundation for the current version of IPI Criminal No. 23.29 and its predecessors. See IPI Criminal No. 23.29, Committee Comments; see also *Shore v. Truman*, 63 Ill. App. 2d. 315 (1965); *Mills v. Edgar*, 178 Ill. App. 3d 1054 (1989). In *Schneider*, our supreme court determined that whether a person was intoxicated is a factual question for the jury, but what constitutes intoxication is a matter of law; thus, a jury instruction defining intoxication is appropriate. *Schneider*, 362 Ill. At 485.

¶ 66 In *People v. Frazier*, which is also cited in the committee comments to IPI Criminal No. 23.29, the defendant was convicted of driving under the influence after the trial court gave the then-current pattern instruction defining intoxication, which was virtually identical to the instruction given in this case:

> "A person is under the influence of alcohol when as a result of drinking any amount of alcohol his mental and/or physical faculties are so impaired as to reduce his ability to think and act with ordinary care." *People v. Frazier*, 123 Ill. App. 3d 563, 569 (1984).

The defendant in *Frazier* argued that the instruction should have referred to driving and his ability to operate a vehicle. *Frazier*, 123 Ill. App. 3d at 570. The *Frazier* court rejected that argument:

> "The instruction did not need to mention driving, for the definition of 'intoxication' does not vary according to the activity engaged in. To hold otherwise would imply that the consumption of alcohol may impair a person's ability to think and act while it leaves intact his ability to drive, a notion we reject. 'Thinking' and 'acting,' the concepts used in the instruction, are broad enough to include all the tasks associated with driving.

Furthermore, the jury did not need to be reminded again that the offense here was based on the defendant's condition while he was driving and not at some other time." *Frazier*, 123 Ill. App. 3d at 570.

¶ 67 Defendant asserts that the jury should have been instructed that she was required to be under the influence of alcohol to such a degree that she was unable to operate a vehicle, and that IPI Criminal No. 23.29 failed to focus the jury's attention on her ability to drive safely. Defendant portrays IPI Criminal No. 23.29 as an overbroad definition of "under the influence" that generalizes the jury's assessment by requiring only that it look to her ability to "think and act with ordinary care," not her ability to drive. Defendant is incorrect. As explained in *Frazier*, it would be unreasonable to believe that alcohol impaired defendant's ability to "think and act" while leaving intact her ability to drive. Moreover, the jury did not need reminding that the offense was based on her condition while she was driving, and not some other activity. Accordingly, the trial court did not abuse its discretion in giving IPI Criminal No. 23.29. Thus, we determine that there was no error, and accordingly, there can be no plain error.

¶ 68                                   4. *Cumulative Error*

¶ 69 Defendant next argues that even if none of the complained-of errors independently warrant reversal, the cumulative impact of the errors surrounding the booking video, the prosecutor's comments, and IPI Criminal No. 23.29, nonetheless necessitate a new trial. Criminal defendants are entitled to a fair, orderly, and impartial trial. *Blue*, 189 Ill. 2d at 138. When an error arises that denies a defendant her right to a fair, orderly, and impartial trial, we must take corrective action to protect fairness and the very integrity of the judicial process. See *Blue*, 189 Ill. 2d at 138. As detailed in our analysis above, the booking video was properly admitted, the prosecutor's comments did not constitute error, and IPI Criminal No. 23.29 was an appropriate instruction.

None of the complained-of errors were, in fact, error. Consequently, defendant has not shown that the cumulative effects of these alleged errors deprived her of her right to a fair trial.

¶ 70                                    III. CONCLUSION

¶ 71    For the foregoing reasons, we affirm the judgment of the circuit court of Lake County.

¶ 72    Affirmed.