THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
KATHLEEN QUICK, Defendant-Appellant.

First District (3rd Division)   No. 1—89—1230

Opinion filed October 7, 1992.—Rehearing denied November 20, 1992.

Gordon H. Berry, of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Judy L. DeAngelis, and Susan Smith Snyder, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CERDA delivered the opinion of the court:

Following a jury trial, defendant, Kathleen Quick, was convicted of solicitation to murder (Ill. Rev. Stat. 1987, ch. 38, pars. 8—1, 9—1) for asking an undercover police officer to murder her husband. At trial, defendant unsuccessfully raised the entrapment and compulsion defenses and was sentenced to 10 years' imprisonment. On appeal, defendant asserts that the trial court erred by (1) ruling that out-of-court statements were inadmissible hearsay even though they were offered to show their effect on her state of mind; (2) allowing improper rebuttal testimony; (3) tendering an improper and confusing jury instruction on the compulsion defense; (4) refusing to answer the jury's request for the dictionary meaning of "imminent"; (5) permitting the State to improperly cross-examine her; and (6) not giving an accom-

plice witness instruction *sua sponte*. We reverse and remand for a new trial.

One of the issues in this case is whether it was prejudicial error for the trial court to give an instruction on the compulsion defense tendered by defense counsel, which omitted the "if she reasonably believed" portion.

On February 28, 1987, defendant paged Sergeant Randal Kacaba, an undercover Illinois State Police officer, and told him that a friend of a friend gave her his beeper number. After defendant stated that she understood that he could take care of her problem, Kacaba told defendant that he did not want to discuss the matter over the telephone, that he already knew what she wanted done, and not to worry about it. Kacaba suggested that she page him later to arrange a meeting.

Kacaba testified that George Lekas, a paid police informant, had earlier told him to expect defendant's call. Lekas said that he had met defendant in a bowling alley bar through Phil Lavin. Kacaba testified that he had never met Lavin, who was not a government agent, had not heard of him prior to February 28, 1987, and knew little about him.

On March 2, 1987, defendant again paged Kacaba. They met in a restaurant parking lot, where defendant got into Kacaba's car and told him that she wanted to have her husband killed because she was tired of his physical abuse and accusations. Defendant stated that killing her husband was her only alternative because he would never agree to a divorce. Defendant then agreed to a $500 down payment for the killing.

Kacaba instructed defendant to bring a picture and information about her husband. He also told defendant that she could change her mind before paying the money, but not afterward, and she should page him again two days later.

On March 4, 1987, Kacaba obtained a court order authorizing him to use a tape recorder, a transmitter, and a video camera for the hotel room where the transaction would occur. Later that day, defendant paged Kacaba and told him that she still wanted to go through with the killing. Kacaba said that he would arrange a meeting with his partner, who would actually do the job. Defendant agreed to meet him the next afternoon with the $500 down payment in $50 bills.

The next day, Kacaba was wired with a recording and transmitting device. When he met defendant, Kacaba told her that they would meet his partner at a Holiday Inn and that she could change her mind at anytime. All she would have to do is get up and leave. Defendant

replied that she understood and that she was a little nervous, but that she was going through with it. The tape-recorded conversation was played for the jury.

Defendant followed Kacaba to the Holiday Inn, where they both went into room 124. Everything that occurred in the room was video taped and shown to the jury over defendant's objection. Bridgeview police officer Richard Cannella, who was posing as a hitman, was already in the room.

Defendant told Cannella that she wanted her husband killed because he constantly beat her up and she was "tired of his shit." After discussing the price, defendant gave Cannella two photographs of her husband and wrote information about him on a pad, including places he frequented and times he left work. Cannella testified that he had heard of Lavin, but did not know if he gave defendant the beeper information or encouraged her to kill her husband.

Defendant testified that she met her husband at a church youth gathering when she was 13 years old and he was 15 years old. They started dating casually, meeting after church on Sundays, spending all day together, and going to church again at night.

Defendant stated that her husband began physically abusing her after she began working. At first, he shoved her, but he later escalated to hitting her, causing bruises. During that time, defendant met Lavin, who knew her husband. According to defendant, they became friends, but not lovers, and defendant confided in Lavin about her husband's physical abuse. During a telephone conversation in 1985, Lavin suggested that he could take care of her husband for her. The trial court sustained the prosecutor's hearsay objection to that testimony.

Defendant also testified that Lavin came to her job and gave her the beeper number. The trial court sustained the prosecution's objection to defendant's testimony about Lavin's statements to her regarding the beeper number; how much it would cost; and what she should say. The trial court ruled that any testimony relating to Lavin's statement to defendant was inadmissible hearsay and admonished the jury to disregard it.

Defendant then testified that she continued having conversations with Lavin, but did not reveal the content of those conversations. Defendant stated that she felt that she had to call the number because Lavin's remarks had scared her. Defendant's testimony of the events leading to her arrest was substantially the same as that of Officers Kacaba and Cannella.

Although defendant did intend to kill her husband at that time, she maintained that she decided to do so only after her husband hit her and after Lavin kept suggesting it to her. Defendant also testified that she thought that killing her husband was her only solution to her marital problems. Defendant testified that she never discussed killing her husband with anyone but Lavin, Kacaba, and Cannella; she never met Lekas; she never asked Lavin to find a hitman to kill her husband; Lavin was the first person to raise the subject; and she did not ask Lavin to come to her workplace to give her the beeper number. Defendant also stated that her previous efforts to employ a hitman to kill her husband involved Lavin, but that she never met or paid anyone to kill her husband prior to this incident. Defendant said that it was Lavin who told her that her husband would never let her have a divorce.

On cross-examination, defendant testified that Lavin kept badgering her about killing her husband. Defendant admitted that she was taught that having her husband killed would be a mortal sin for which she could go to hell for eternity. She also stated that she told Cannella that he could make extra money by robbing her husband's truck.

According to defendant, Lavin had previously informed her that it would cost $1,000 to have her husband killed. Defendant stated that she was not a tough person, but tried to appear tough so that the "hitmen" would believe her. She claimed that she did everything she did because she was told to do so by Lavin and the "hitmen."

In the State's rebuttal case, Lavin testified over defendant's objections. He stated that he met defendant in 1984 or 1985 and that they had a year-long sexual affair beginning in the summer of 1985 or 1986. Lavin knew defendant's husband, was friendly with him, and did not believe he had a bad temper. According to Lavin, defendant frequently complained that her husband beat her and that she was not happy in her marriage, but Lavin thought she was fantasizing. Lavin stated that only once, when he and defendant were both naked, did he see a bruise on defendant's thigh.

Lavin testified that he became annoyed when defendant repeatedly asked if he knew someone who could kill her husband. When Lavin saw Lekas in a bowling alley bar in February 1987, he told Lekas that someone kept bothering him about wanting to get someone killed. Lavin had known Lekas for four or five years and considered him a con man. Two days later, in the bowling alley, Lekas gave Lavin a piece of paper with a phone number and the name "Rich" on it and he told Lavin to have his friend call the number and "they'll take care

of the problem." Even though Lavin thought the number was phony, he gave it to defendant so that she would stop bothering him.

According to Lavin, he told defendant that he had talked to a guy, had no idea what it was or who it was for, and said, "it's yours, I don't want nothing to do with it." From that time until defendant was arrested, Lavin claimed that he did not speak to her.

Lavin denied telling defendant that she would be killed if she did not call the number and ask for Rich; that he told her what to say after calling the number; or that he knew about her meeting at the Holiday Inn on March 5, 1987. Lavin also denied ever working as a police agent or ever working for or with Lekas.

At the instructions conference, the trial court allowed a compulsion instruction, but not an entrapment instruction since there was no evidence that Lavin was an agent acting on behalf of Lekas, who was a paid government informant. After the jury deliberated, defendant was convicted of solicitation of murder and sentenced to 10 years' imprisonment. We reverse the conviction and remand the case for a new trial.

On appeal, defendant asserts that she was denied a fair trial because she was prohibited from testifying to Lavin's out-of-court statements, which were the crux of her defense. Defendant maintains that Lavin and Lekas were working together to entrap her into committing the offense and that she felt compelled to go through with the crime because Lavin told her that the hitmen would kill her if she backed out.

The trial court barred defendant from testifying to any statements by Lavin on the basis that they were hearsay. Defendant contends that the statements were not hearsay because they were not being admitted for the truth of the matter asserted. Instead, they were being offered for their effect on her state of mind. We agree.

Defendant relied on cases where out-of-court statements were not hearsay. See *People v. Moore* (1975), 27 Ill. App. 3d 337 (it was improper to prohibit the defendant from testifying about conversations that were the important factual foundation of the defendant's claim that he shot the deceased in self-defense); *People v. Hines* (1975), 28 Ill. App. 3d 976 (conversation between the killer and defendant's representative about how to commit the crime was proper to show that they had reached an agreement); *People v. Sadaka* (1988), 174 Ill. App. 3d 260 (evidence of a known heroin trafficker's telephone number found on the defendant was not hearsay because it was introduced to show an association between the defendant and the person whose telephone number was in defendant's possession); *People v.*

*Husted* (1981), 97 Ill. App. 3d 160 (exclusion of a conversation that was integral to the defendant's theory of defense could deny the defendant a fair trial).

Defendant then analogizes self-defense cases to the compulsion defense, asserting that out-of-court statements by others could similarly compel an individual to commit a crime. See *People v. Hoddenbach* (1983), 116 Ill. App. 3d 57; *People v. Moore* (1980), 89 Ill. App. 3d 202; *People v. Ganci* (1978), 57 Ill. App. 3d 234; *People v. Limas* (1977), 45 Ill. App. 3d 643; *People v. Davis* (1963), 29 Ill. 2d 127.

The State's response is fundamentally flawed. It does not address defendant's argument that the out-of-court statements were not hearsay. Instead, the State concludes that the trial court properly excluded Lavin's out-of-court statements because they were hearsay that did not come under any exception to the hearsay rule. The State argues that the statements were hearsay because they were offered as substantive evidence to prove the truth of defendant's own statements that she was afraid she would be hurt or killed if she backed out of killing her husband. The State also maintains that defendant cannot prove her own out-of-court statements. Furthermore, the State contends that defendant cannot use the state of mind exception to the hearsay rule to admit Lavin's statements to prove her own state of mind because she was not the declarant. *People v. Berry* (1988), 172 Ill. App. 3d 256.

The State is confusing two separate hearsay concepts: nonhearsay statements or verbal acts, offered to show the effect of the declarant's statement on the person hearing it; and a hearsay exception, which permits out-of-court statements to prove the declarant's state of mind, emotion, or sensation, when his state of mind is at issue or in cases when a declarant's statements of intention are used as proof that the intended act was done.

The State then argues that the trial court has the discretion to determine whether evidence is relevant and admissible. (*People v. Hayes* (1990), 139 Ill. 2d 89.) However, there is no issue of relevancy raised here. The testimony was excluded on the basis of hearsay, not because it was irrelevant.

This case is similar to *People v. Perez* (1991), 209 Ill. App. 3d 457, 466, where the trial court erred by not allowing the defendant to testify fully to out-of-court statements consisting of threats and an offer of cocaine, which influenced his state of mind, even though he was allowed to testify to some of those statements. Furthermore, in *Perez*, the defendant's motive was material to the issue of a lack of predispo-

sition, which was an essential element of his entrapment defense. *Perez*, 209 Ill. App. 3d at 466.

■ An out-of-court statement used for purposes other than establishing the truth of the matter asserted may be admissible to show the state of mind of the recipient after hearing the statement. (*Perez*, 209 Ill. App. 3d at 466.) If that statement is offered to prove its effect on the listener's state of mind or to show why the listener acted as she did, it is not hearsay. (*People v. Jackson* (1986), 145 Ill. App. 3d 626, 636.) Furthermore, where the intention, motive, or belief of the accused is material to the issue, she should be allowed to testify directly to that fact, and to have the circumstances surrounding the act considered in connection with her testimony. *Perez*, 209 Ill. App. 3d at 466.

■ Lavin's out-of-court statements were improperly excluded as hearsay. They were offered to show their effect on defendant's state of mind after she heard them. Furthermore, Lavin's out-of-court statements were crucial to defendant's defense. By barring that testimony, the trial court's rulings denied defendant her constitutional right to present a defense. (*Chambers v. Mississippi* (1973), 410 U.S. 284, 35 L. Ed. 2d 297, 93 S. Ct. 1038; *Washington v. Texas* (1967), 388 U.S. 14, 18 L. Ed. 2d 1019, 87 S. Ct. 1920; *People v. Manion* (1977), 67 Ill. 2d 564.) Accordingly, we reverse defendant's conviction and remand this cause for a new trial.

Defendant then asserts that the trial court's error prohibiting her from testifying to Lavin's statements was compounded by Lavin improperly testifying in the State's rebuttal case. We agree.

Lavin gave a detailed version of his statements to defendant, including that (1) defendant constantly complained of beatings by her husband, but Lavin thought she was fantasizing; (2) starting as early as 1985, defendant repeatedly said that she wanted to have her husband killed; (3) Lavin did not tell her that she or her children would be harmed if she did not call the number; and (4) Lavin did not coach defendant about what to say at the Holiday Inn.

Rebuttal testimony is testimony that is adduced by the prosecutor to explain, repel, contradict, or disprove evidence given by the defendant. (*People v. Hunter* (1984), 124 Ill. App. 3d 516, 538.) Since defendant was not allowed to testify about Lavin's statements and the jury was instructed to disregard her attempts to describe them on cross-examination, Lavin's detailed rebuttal testimony about those statements was improper.

Next, defendant asserts that the trial court erred by giving the jury a confusing instruction on the compulsion defense, which, in ef-

fect, instructed the jury on the wrong standard. The State contends that defendant waived this issue. Not only did she not object to the instruction at trial, the State argues, but it was the defense counsel who prepared and tendered the instruction. Since the alleged error affected defendant's substantial rights, we will consider it as plain error. *People v. Almo* (1985), 108 Ill. 2d 54, 66.

The Illinois Pattern Jury Instructions, Criminal, No. 24—25.21 (2d ed. 1981) (hereinafter IPI Criminal 2d) on the compulsion defense states:

> "It is a defense to the charge made against defendant that [s]he acted under the compulsion of threat or menace of the imminent infliction of death or great bodily harm, if [s]he reasonably believed death or great bodily harm would be inflicted upon [her] if [s]he did not perform the conduct with which [s]he is charged."

The instruction given to the jury differed from the IPI instruction in that it omitted a substantial part of the instruction. The instruction given to the jury was:

> "It is a defense to the charge made against the defendant that she acted under the compulsion of threat or menace of the imminent infliction of death or great bodily harm would be inflicted upon her if she did not perform the conduct with which she is charged."

Because the words "if she reasonably believed death or great bodily harm" were omitted, the trial court committed plain error in giving the instruction to the jury.

■ A defendant is entitled to the benefit of any defense shown by the entire evidence and very slight evidence will justify the giving of an instruction. (*People v. Bratcher* (1976), 63 Ill. 2d 534, 540.) A jury instruction may not be misleading or confusing and should fully and fairly inform the jury of the law applicable to the respective theories of defense. (*People v. Gathings* (1981), 99 Ill. App. 3d 1135, 1138.) The court's duty is to give the jury proper guidance, not to generate confusion. *People v. Jenkins* (1977), 69 Ill. 2d 61, 66.

■ The compulsion defense instruction given in this case was confusing and incorrect. The trial court had the duty to clarify that confusion even though the defense counsel had tendered the erroneous instruction. The issue was not whether defendant would be harmed, since it was reasonable for the jury to infer that defendant would not have been harmed because the "hitmen" were actually undercover police. Instead, the issue was what defendant reasonably believed. If she reasonably believed that she would be injured, that

would be sufficient for the compulsion defense. The error was so substantial that it reflected on the fairness of the trial. (*People v. Linscott* (1991), 142 Ill. 2d 22, 28.) Since the trial's outcome could have been different if the correct instruction had been given, the instruction was prejudicial error.

■ Next, defendant asserts that the trial court erred when it refused to answer the jury's request for the dictionary definition of the word "imminent" contained in the compulsion defense instruction. Defendant waived this issue because she did not object at trial and did not include the error in her post-trial motion.

■ Defendant then asserts that the trial court erred in permitting the State to cross-examine her about whether soliciting her husband's murder was a mortal sin for which she could go to hell for eternity. The State maintains that the cross-examination questions were in response to defendant's direct examination testimony that she met her husband at a church youth gathering and the two continued to see each other on Sunday afternoons after church. The State also argues that the questions were not offered to prove bad moral character, but to determine when defendant made the decision to kill her husband and how important that decision was to defendant.

The trial court erred in allowing the testimony. The court should not permit cross-examination that is designed to insult, degrade, or humiliate a witness (*People v. Brown* (1912), 254 Ill. 260, 269) or whose only apparent purpose is to demonstrate that the defendant was of bad moral character (*People v. Butler* (1974), 58 Ill. 2d 45, 50). Inquiring into defendant's religious beliefs was improper. It is disturbing that the prosecutor asked those questions. There is a difference between religious activities and religious beliefs. Defendant's testimony about her religious activities did not allow the State to question her about her religious beliefs.

■ Finally, defendant waived her argument that the trial court erred by not *sua sponte* giving the jury an accomplice instruction. Defendant did not tender such an instruction and the evidence did not support such an instruction. It is the burden of the party who desires a specific instruction to present it to the court and request that it be given to the jury. (*People v. Turner* (1989), 128 Ill. 2d 540, 562; *People v. Bodoh* (1990), 200 Ill. App. 3d 415, 431.) A trial court is only required to offer an instruction *sua sponte* if it relates to the elements of the offense charged, the presumption of innocence, or the burden of proof. (*Turner*, 128 Ill. 2d at 562-63.) Moreover, a court is obligated to use restraint in giving instructions *sua sponte* so as not to interfere

with or frustrate defense strategy. *People v. Garcia* (1988), 169 Ill. App. 3d 618.

Based on the forgoing, defendant's convictions are reversed and remanded for a new trial.

Reversed and remanded.

GREIMAN, P.J., and TULLY, J., concur.