2020 IL App (2d) 190127-U
No. 2-19-0127
Order filed July 20, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 10-CF-2512 |
| MARICELA ARCIGA, | ) ) | Honorable Susan Clancy Boles, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE McLAREN delivered the judgment of the court.
Justices Schostok and Bridges concurred in the judgment.

**ORDER**

¶ 1   *Held*:   (1) Trial court failed to properly admonish and question the prospective jurors pursuant to Supreme Court Rule 431(b); (2) in a case involving the affirmative defense of entrapment, defense counsel was ineffective for failing to present to the jury the fact defendant had no criminal history; (3) defense counsel was ineffective for failing to properly argue the admissibility of testimony as non-hearsay instead of as impeaching; (4) trial court erred in failing to provide definitions requested by the jury during their deliberations, and defense counsel was ineffective for failing to object to the court's decision and attempt to provide definitions.  Trial court reversed, cause remanded.

¶ 2   Defendant, Maricela Arciga, was charged by indictment with one count each of solicitation

of murder (720 ILCS 5/8-1.1(a) (West 2008)) and solicitation of murder for hire (720 ILCS 5/8-

1.2(a) (West 2008)). The charges arose out of defendant's alleged attempts to find someone to murder her former boyfriend, Juan Garcia. The case proceeded to a jury trial, where defendant raised the affirmative defense of entrapment. See 720 ILCS 5/7–12 (West 2008). The jury found defendant guilty of both counts, and the trial court sentenced defendant to a prison term of 20 years on the solicitation of murder for hire charge (the other charge merged). Defendant now appeals from her conviction raising various contentions of error by the trial court and ineffective assistance by her trial counsel.[1] We reverse defendant's conviction and remand the cause for a new trial.

¶ 3                                  I. BACKGROUND

¶ 4      At trial, the State presented the testimony of Special Agent David Gomez of the Bureau of Alcohol, Tobacco, Firearms, and Explosives. Gomez was asked by the Aurora Police Department to pose as the cousin of a confidential informant in the investigation of the murder-for-hire investigation of defendant. He met with defendant and the informant, Gabriel Guajardo on the afternoon of September 26, 2010. During that conversation (which was recorded and transcribed and presented to the jury), defendant explained that she had broken up with her ex-boyfriend (Garcia) because he had cheated on her. However, he was contacting her again, telling her that she would get back with him, sell drugs for him, "or um, to pay them for my life." Defendant explained, "I don't want to be with him. And, like I told him, it's either him or me. 'Cause I don't want to. Like do, do anything with him." When Gomez asked her what she wanted to have done,

---

[1] Defendant initially failed to file a notice of appeal. However, the trial court granted defendant's amended postconviction petition based on ineffective assistance of trial counsel for failure to file a notice of appeal. The trial court granted leave to file a late notice of appeal on February 13, 2019.

she stated, "Well I did think about it, but [Guajardo] was the one that told me that um, you can do it. Go and basically kill him. That's what he told me." Gomez asked defendant if that was what she wanted, and she replied:

"That's what I want. I don't want him to be...well, I don't want to be with him. And I don't want anything to do with him. And I know that, like I think the only way that he is not gonna bother me, no more, is that way."

¶ 5    Gomez asked how she wanted to have Garcia killed; defendant first stated that she had to leave to drop off her child. Asked again, she said, "How? I just don't want to have him in my life no more." Asked another time, she stated, "Well, you're the, the one who knows, I just don't want him in my life." Gomez verified, "I mean, do you want him dead and out of your life?" Defendant replied, "Yeah." Defendant gave Gomez a photograph of Garcia and personal information about him. Gomez asked if defendant wanted Garcia stabbed or shot, and she replied, "Shot." When asked, she said that she did not want the body found.

¶ 6    Gomez asked what was in it for him; defendant replied:

"Well like I was talking to [Guajardo], um, he said that it is a thousand dollars? And to give you two upfront and that we could work out a payment (inaudible)."

When Gomez asked if she had two thousand dollars, she said that she did not. Defendant told Gomez that Garcia had court on the 8th and would be going to jail for a year, so it had to be done quickly. She gave additional information on Garcia's home and route traveled to work. Gomez tried to get defendant to agree to have Garcia meet with him and "front" him cocaine before Gomez killed him. He then told defendant that he would call her.

¶ 7    Defendant and Gomez called each other multiple times in the next week, speaking several times about the plan to have Garcia front him some cocaine. On October 4, defendant and Gomez

met in a parking lot. The recording and transcript of this conversation were entered into evidence. Defendant said that Garcia would not get involved in the cocaine deal. She and Gomez again discussed how she would pay Gomez the $2000. The following colloquy then took place:

> "[Gomez]: All right, so um, just so, just so I'm straight. The job is gonna get done tonight. Alright, he's f***ing dead; I'm shooting him. And we'll leave it so the body can be found. Or you don't want the body found?
>
> [Defendant]: Either or.
>
> [Gomez]: It doesn't matter?
>
> [Defendant]: It doesn't matter.
>
> [Gomez]: Okay. 'Cause the minute, you step out of this car, you ain't gonna be able to stop me. It's gonna be done.
>
> [Defendant]: Um huh.
>
> [Gomez]: And you're good with that?
>
> [Defendant]: I'm good with that.
>
> [Gomez]: Okay, alright. All right, I will ah, I'll call you later then.
>
> [Defendant]: Okay."

Defendant was arrested as she drove away from the meeting.

¶ 8 Detective John Munn of the Aurora Police Department testified that he interviewed defendant the night that she was arrested. Defendant said that she met Gomez (under the name Dave) through Guajardo, a coworker. When asked why she was in the parking lot talking with Dave, she said that she always met with her friends in parking lots. They were talking about nothing special. Munn then told defendant that they had been listening to "Dave's" phone calls since he had been released from prison and they knew what she and Dave were discussing. She

then said that she asked Dave to kill her boyfriend. She said that Garcia wanted her to sell drugs and that, if she did not do so, he would kill her. Defendant said that she had told the police about these threats but was told that the police could not help, since nothing physical had occurred. She said that she knew that, if she went back with Garcia, "it was either her life or his." Defendant explained the payment plan with Dave and that Garcia was to be shot that night, as Garcia was probably going to jail for a year. Munn described her demeanor as "nonchalant" and "very calm." Defendant also told how Guajardo had nothing to do with the murder plans, as she and Dave agreed to leave him out.

¶ 9     Defendant then gave a recorded statement. The recording and a transcript were entered into evidence. Much of the statement was the same as her oral statement, but she also said that she met with Dave that evening "to be sure that, that's what I want." Asked if she was "sure" at that time, she replied, "I wasn't for sure, but it was the only option for me, that I think that I have." She thought that she had no other options because, when she went to the police on July 4, they said that they could do nothing because Garcia had not hit her. Defendant was afraid that, even though Garcia was to go to prison for up to a year, he would want to get back with her when he got out, and she feared that he would possibly do something to her parents. She was sorry that the situation turned out as it did, but she knew it was illegal.

¶ 10     After the State rested, defendant recalled Munn. Munn testified that, on September 22, 2010, he received information from Officer Zegar about a possible murder for hire, which led to a meeting involving Munn, his partner, Detective Moore, and Guajardo. Based on the information that he received from Guajardo, Moore petitioned for and obtained an eavesdropping device to record Guajardo's planned meeting with defendant that evening. The device was borrowed from the Federal Bureau of Investigation. While Guajardo met with defendant in a parking lot for about

40 minutes that evening, the recording device did not record the conversation. Munn believed that the equipment was faulty.

The next day, Munn contacted Special Agent Gomez and petitioned for another eavesdropping order. Gomez and Guajardo were introduced on September 26, and they arranged for a meeting with defendant for that evening. That meeting was successfully recorded. Munn stated that he and Moore were Guajardo's handlers. Guajardo received assistance for his work on this case, including the recall of a warrant in a traffic case and dismissal of the traffic charge. It was Munn and Moore's intention to record the conversation between Guajardo and defendant on September 22, and Munn found no indication that Guajardo had anything to do with the failure of the recording device. Guajardo did not tell Munn that he was having a relationship with defendant.

¶ 11    Detective Darrell Moore testified to much of the same information as Munn did. Moore received the recording device from Special Agent Lapp of the F.B.I. Moore had used a similar device before and believed the device was in good condition. He did not test the device. Moore had pressed the button to activate the device to record a phone call between Guajardo and defendant, and then he gave it to Guajardo, who carried the device in his pants pocket to the meeting with defendant in the parking lot. Moore and Munn observed the meeting from about three quarters of a block away. Defendant got into Guajardo's car, went back to her own car after a couple of minutes, the returned to Guajardo's car for 41 minutes.

¶ 12    Although the recording device recorded only Guajardo's telephone call to defendant and not the meeting, Moore created a report regarding the conversation from the meeting based on what Guajardo told him. Based on that information, they contacted Gomez to operate undercover and obtained another eavesdrop order. After Guajardo introduced Gomez to defendant as his cousin, no one instructed Guajardo to have any more contact with defendant; however, they would

want an informant to maintain the normal contact that they had with the person they were informing on. Moore could not recall if they ever gave Guajardo any money. This case was not Guajardo's first as a confidential informant for the Aurora Police Department, nor was it his last.

¶ 13    On cross-examination, Moore stated that he had used a recording device similar to the one that failed to record Guajardo's meeting with defendant on seven to nine occasions. However, unlike the other devices, this device required the start button to be pushed again after a prior recording. Thus, after recording the telephone call between Guajardo and defendant, Moore should have pressed the start button again to record the meeting. He did not know this until after he had learned that the recording had not been made.

¶ 14    Guajardo testified that he worked with defendant in September 2010. He began calling her and texting her around September 21, including texts regarding the price, method of payment, and proposed perpetrator of Garcia's murder. Other texts showed a flirtatious to sexual relationship, with requests from Guajardo for sexy pictures and sex. However, Guajardo denied ever having sex with defendant, and denied giving her a ring. Guajardo also denied that, as the September 22 meeting, defendant told him that she did not want the murder for hire to go on. According to Guajardo, "She said she wanted my cousin to do it so she brought a picture." He denied meeting with defendant on the afternoon of October 4, 2010, the day on which defendant was arrested, and specifically denied having sex with her on that day.

¶ 15    Guajardo admitted that, while he told Officer Zegar on September 22 that defendant was seeking to pay someone $6000 to kill Garcia, on that same day he was texting with defendant about paying $1000 for the act with only $200 up front. He had known Zegar since he was in his teens and worked with him and other officers on many cases. Guajardo had sometimes received cash for his help, but could not remember when or how much.

¶ 16    Guajardo knew that defendant had issues with Garcia, but he denied telling defendant that he would beat up Garcia or that he would "take care" of him. He denied telling defendant that he was wanted for murder or that he could not "take care" of Garcia because there was a warrant for his arrest.

¶ 17    On cross-examination, Guajardo stated that he met defendant approximately a week before he told Zegar that defendant wanted to hire a hitman. He had heard rumors at work that defendant was looking for someone to kill her boyfriend, so he approached her about it. She told him that she was looking for someone to kill her boyfriend. Prior to that, defendant had told him some things about Garcia—that he forced himself on her, beat her, would not let her out of the relationship. Guajardo never offered to kill Garcia. Defendant told him that someone had offered to do it for $6000, but she could not pay that much.

¶ 18    Guajardo had worked with Zegar in the past, and had been paid $190, but had not worked with him in some time. For his work on this case, he got an outstanding traffic warrant quashed and his court supervision in the case dismissed. Moore and Munn came up with the story to feed defendant: that his cousin who just got out of prison would kill Garcia for $1000 with a $200 down payment. He told defendant to bring a picture to the meeting. He did not turn off the recording device during his meeting with defendant; he did not know how to turn if off, and he could not tell whether it was recording. During that meeting, he twice made defendant say out loud that Garcia was the person that she wanted killed so that she could be heard saying it on the recording. He did not know that the recording had failed until just before trial. He denied that it was his idea for defendant to hire a hitman as well as telling defendant that she had to hire a hitman to kill her boyfriend. He never did anything that could be construed as forcing her to hire a hitman to kill her boyfriend. The ides to hire a hitman to kill Garcia was defendant's.

On redirect examination, Guajardo stated that he told Munn and Moore that defendant had $6000 but did not have $10,000. He later could not remember if defendant told him that or if that was only a rumor at work.

¶ 19    Luis Arciga, defendant's father, testified that defendant lived with him both before and after she lived with Garcia. Garcia knew where Luis lived. Sometime in late 2009, after defendant had broken up with Garcia and moved back to his house, defendant's car was stolen; the police later found it burning. Other cars at Arciga's home sustained broken windows in early 2010. The police never determined who stole defendant's car or damaged the other cars. After defendant moved out of Luis house in 2010, the incidents of damage stopped.

¶ 20    Maria Arciga, defendant's sister, testified that she lived with defendant and defendant's infant son from April to October 2010. She picked up defendant's belongings from jail and noticed a pearl ring that she had never seen before. She did not know how defendant got the ring or who gave it to her.

¶ 21    Defendant testified that she lived with Garcia between May and October 2009. She related that Juan had a stroke in September 2009; she called 911 and was told by a paramedic that, because she called, Garcia survived. The were evicted from their apartment in October, and that is when she broke up with Garcia. She moved back to her family home, taking her car, which she had shared with Garcia, with her. As she and Garcia worked at the same office, she still saw him, and Garcia called her daily. Defendant believed that Garcia burned her car and damaged the other family vehicles because he was mad at her. In late June 2010, she met with Garcia at a McDonald's parking lot and recorded their conversation on her cell phone; during that conversation, she concluded that Garcia had damaged the vehicles. On July 4, she took the recording to the Aurora Police Deapartment and told them about the damage and other threats from Garcia, but the officer

never made a report and told her that it would be pointless to try to get an order of protection because Garcia had never hit her. Juan called her cell phone while she was at the department. The officer got on the phone and identified himself, but Garcia hung up. The calls from Garcia stopped until the end of August.

¶ 22    Defendant changed jobs at the beginning of August 2010, and she met Guajardo at her new place of employment. They spoke daily; he listened to her and was a comfort to her. She played for him the tape of Garcia that she had taken to the police. They had conversations about how to solve her problems with Garcia. Starting September 21, they engaged in multiple phone calls and texts on a daily basis. On September 22, a series of texts involved a job that Guajardo's cousin was going to do for defendant. One text from Guajardo said that his cousin asked, "how much," and defendant replied that she could give him 200 dollars for now.

¶ 23    Later, Guajardo called her to set up a meeting for 6:00 that evening in a grocery store parking lot to discuss his cousin. Defendant drove to the meeting and got into Guajardo's car. She did not have the picture of Garcia with her. She told Guajardo that she did not want to hire his cousin and that she did not want anything to happen to Garcia. Defendant told Guajardo that she was afraid that, if his cousin "would do something wrong" and Garcia found out that she had something to do with it, Garcia would kill both her and Guajardo, and her family would be in danger. According to defendant, Guajardo "got mad;" she kept telling him that she did not want to go along with his plan, but he insisted that his cousin was ready and waiting. Guajardo told defendant to get Garcia's picture, which she retrieved from her car and gave to him. She told Guajardo that she did not have any money and that she did not want to get a loan. She never told him that she had $6000. She told Guajardo that she was afraid that Garcia would kill her and take her son away from her parents. Nothing was resolved during the meeting, which lasted between

30 and 40 minutes. She received 12 phone calls from Guajardo over the rest of the evening; she never told him that she agreed with his plan.

¶ 24 She and Guajardo talked at work in the early morning hours the following day. She told Guajardo that she was happy that he was in her life. He was supportive of her and he knew that he was the only person she could talk to about what was happening with Garcia. They continued texting, speaking on the phone, and talking in person that day. In one exchange, Guajardo asked if she trusted him with her life; when asked "Why with my life?," Guajardo explained, "Because if u do then u fully do trust me." Defendant responded, "I do trust you with my life even when I don't know you much yet."

¶ 25 From that point on, her relationship with Guajardo grew closer. Their text messages became more graphic, and the two ultimately engaged in sex on October 2 and 4, at her apartment.

¶ 26 Gomez had talked to defendant on September 29 about trying to get Garcia to front Gomez cocaine, which was to be considered as part of defendant's payment to Gomez. That plan was Gomez's idea. She later told Gomez that she had called Garcia and discussed the cocaine, but she never actually called Garcia about it. She did not follow the plan because she was afraid of Garcia. She thought that, since she had no money and there was no cocaine, nothing would proceed.

¶ 27 Defendant testified that, in one of her meetings with Gomez, he asked for jewelry, in addition to money and cocaine. She told him that she did not have any. All she gave him was $200 cash. On October 2, Gomez called her to ask about the cocaine. Guajardo was with her when this call occurred, and he heard that there was to be no cocaine. Prior to her meeting that night with Gomez, Guajardo met defendant in a parking lot and gave her a ring to use for payment, as she had no money or cocaine. Guajardo told her it was worth $500. Defendant kept the ring

and told Gomez that night that she had no jewelry. Again, she believed that, if there was no money, cocaine, or jewelry, nothing would be done to Garcia.

¶ 28    Defendant stated that, after she was arrested, she told police that Guajardo knew nothing about the plan to kill Garcia. She said that because she cared for Guajardo and because he had told her that there was an outstanding warrant for his arrest. She loved him and did not want him to go to jail. She continued talking with Guajardo while in jail, and it was "a long time" before she realized that he was involved with the police.

¶ 29    On cross-examination, defendant admitted that she provided Garcia's information on the photo of Garcia, including where he lived and when he traveled to and from work. She knew that she was talking to Gomez about paying him to kill Garcia killed and that she chose to have Garcia shot. She reiterated that she never talked to Garcia about the cocaine because she did not want Garcia to be killed. She believed that Garcia was a danger to her family.

¶ 30    The defense had admitted into evidence certified copies of Guajardo's two convictions for felony theft. The defense then rested. After hearing argument, the trial court determined that defendant had met her burden to validly raise the defense of entrapment.

¶ 31    The State then presented the testimony of Michael Weis, who testified that, in May 2009, he lived in the same apartment building with defendant, 301 Mulhern Court in Yorkville. On an unspecified date, he had a conversation with defendant during which he asked her if everything was alright with her and her children as far as their safety and her boyfriend. She said that she was having trouble with her boyfriend and asked if Weis knew anybody that would "f**k him up." Weis said that he did not but that he would let her know if he did. Defendant said that "she would like him f**ked up" and that she "would pay money to have him taken care of." She said that "[s]he wants him shot." He did not report it to the police at that time because he did not "feel as

though she was really being real about it." He reported the incident after reading a newspaper article about this incident. Weis admitted that he had convictions for aggravated identity theft, insurance fraud, possession of a controlled substance, DUI, and violation of the Electronic Fund Act. He did not know defendant before he lived in the apartment complex, and he did not have any contact with her since that conversation.

¶ 32    On cross-examination, Weis stated that defendant had two children, one "very small" and the other "maybe approximately three years old." He was not sure if, the first time he talked to the police, that defendant had offered to pay him or someone else $2500. His story to police also changed in a subsequent conversation with Munn, when Weis added that defendant told him that her boyfriend was an ass, beat her, and was mean to her kids. He did not know defendant before that conversation, other than to say hello. Weis admitted that he asked Munn and an assistant state's attorney "for some favors," but denied that they had anything to do with a legal matter or with money. On redirect, Weis stated that the help he sought was in adopting a child, and neither the police nor the state's attorney's office promised any help. He received no benefit for testifying.

¶ 33    Defendant testified again in surrebuttal. Defendant stated that she had one child, who would have been five years old in 2010. She never lived at 301 Mulhern but lived at 305, a building separated from 301 by a street. She did not know Weis and had never seen him before.

¶ 34    The jury returned guilty verdicts on both counts, and this appeal follows.

¶ 35                                    II. ANALYSIS

¶ 36    Defendant first contends that the trial court erroneously questioned prospective jurors before the trial began. According to defendant, the trial court failed to properly admonish and question the prospective jurors pursuant to Supreme Court Rule 431(b), which provides:

"The court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt;(3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that the defendant's failure to testify if a defendant does not testify it cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's failure decision not to testify when the defendant objects.

The court's method of inquiry shall provide each juror an opportunity to respond to specific questions concerning the principles set out in this section."  SCR 431(b) (eff. July 1, 2012).

¶ 37    The trial court told the first venire:

"I'm going to explain to you certain principles, and if you understand the principles, agree with those principles and accept those principles, please do not raise your hand and that will signify that you understand, you agree and you accept those principles.  If you don't understand or accept these principles or don't agree with them, I would ask that you raise your hand in response to my questions."

After each principle, the court asked if anyone had "any difficulty or disagreement" with the principle.  No venireman raised a hand.  The same admonishment was also given to a second venire.

¶ 38    We first note that defense counsel did not object to the trial court's questioning of the venires, nor was the issue contained in defendant's amended motion for a new trial.  Such failures result in forfeiture of an issue on appeal.  See *People v. Johnson*, 238 Ill.2d 478, 484 (2010).

However, under Illinois's plain-error doctrine, a reviewing court may consider a forfeited claim when:

> " '(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence.' " *Id*., quoting *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

Our supreme court has determined that a violation of Rule 431(b) is not cognizable under the second prong of the plain-error doctrine. See *People v. Thompson*, 238 Ill. 2d 598, 611 (2010).

¶ 39    It is clear that an error occurred. In *People v. Dismuke*, 2017 IL App (2d) 141203, this court dealt with this same trial court giving the same admonishment to the venire and found the admonishments to be "unclear and inadequate":

> "First, the court instructed the potential jurors *not* to raise their hands if they understood, agreed with, and accepted the *Zehr* principles. Second, the court instructed the potential jurors to *raise* their hands in response to its question if they did *not* understand or accept the principles. Third, after reciting each principle, the court changed the question from 'understand and accept' to 'difficulty or disagreement.' Thus, the potential jurors received three different instructions about what they were supposed to do with their hands. More problematic was the court's substitution of 'difficulty or disagreement' for 'understand and accept.' " *Id*. ¶ 54.

Finding that, under a plain-error analysis, the evidence was closely balanced, we concluded that the trial court's failure to comply with Rule 431(b) required reversal and a new trial. *Id*. ¶60.

¶ 40    Here, too, we find that the evidence was closely balanced.  A defendant who raises entrapment as an affirmative defense necessarily admits to committing the crime, albeit because of improper governmental inducement.  *People v. Bonner*, 385 Ill. App. 3d 141, 145 (2008).  Thus, the commission of the solicitation was not in issue.  In order to establish this defense, a defendant must present evidence that: (1) the State induced or incited her to commit the crime; and (2) that she lacked the predisposition to commit the crime.  *People v. Ramirez*, 2012 IL App (1st) 093504, ¶ 28.  If the defendant presents some degree of evidence to support his defense of entrapment, the burden then shifts to the State to rebut that defense beyond a reasonable doubt.  To prove predisposition, the evidence must establish that the defendant was ready and willing to commit the crime without persuasion and before his or her initial exposure to government agents.  *Id.*, ¶ 38.

¶ 41    We conclude that that the evidence in this case was so closely balanced that the error in admonishing the venires alone threatened to tip the scales of justice against the defendant, so that a plain error analysis is appropriate.  The question of inducement was all that was at issue in this case, and this was clearly a "he-said/she-said" issue between Guajardo and defendant, with the credibility of each to be determined by the jury.  Reviewing this as plain error, we find no reason to depart from our analysis and holding in *Dismuke* and similarly conclude that the trial court's admonishments to the venires failed to comply with Rule 431(b) and requires reversal and a new trial.

¶ 42    As we are remanding this cause for a new trial, we will also address defendant's other contentions on appeal, as they may arise on retrial.

¶ 43    Defendant next contends that she received ineffective assistance of counsel. Claims of ineffectiveness of counsel are judged under the familiar standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984) and adopted by our supreme court in *People v. Albanese*, 104 Ill.2d 504 (1984)). A defendant must show that (1) counsel's performance fell below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *People v. Manning*, 241 Ill. 2d 319, 326 (2011). To satisfy the deficient-performance prong of *Strickland*, a defendant must show that counsel's performance was so inadequate that counsel was not functioning as the counsel guaranteed by the sixth amendment. *Id*. at 326-27. Counsel's performance is to be measured by an objective standard of competence under prevailing professional norms. *Id*. at 327. A reviewing court accords much deference to trial counsel's judgment and strongly presumes that counsel's conduct falls within the wide range of reasonable professional assistance. *People v. Richardson*, 189 Ill. 2d 401, 413 (2000). In order to establish deficient performance, a defendant must overcome the strong presumption that the challenged action or inaction of counsel may have been the product of sound trial strategy. *Manning*, 241 Ill. 2d at 327. Matters of trial strategy are generally immune to claims of ineffective assistance of counsel. *Id*.

¶ 44    In addition, a defendant must show a reasonable probability that, but for counsel's ineffectiveness, the result of the proceeding would have been different. *Strickland*'s prejudice prong is not simply an "outcome-determinative" test but may be satisfied if the defendant can show that counsel's deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair. *People v. Jackson*, 205 Ill. 2d 247, 259 (2001). A defendant need not prove by a preponderance of the evidence that the outcome would have been different; "prejudice may be found even when the chance that minimally competent counsel would have won an acquittal is

'significantly less than 50 percent,' as long as a verdict of not guilty would be reasonable." *People v. McCarter*, 3845 Ill. App. 3d 919, 935 (2008) quoting *Miller v. Anderson*, 255 F. 3d 455, 459 (7th Cir.2001). We may resolve a claim of ineffectiveness by reaching only the prejudice component, as a lack of prejudice renders the issue of counsel's performance irrelevant. *People v. Erickson*, 161 Ill. 2d 82, 90 (1994). Since (as here) a trial court is typically not asked to rule on whether trial counsel was ineffective, an appellate court generally reviews claims of ineffective assistance *de novo*. *People v. Utley*, 2019 IL App (1st) 152112, ¶ 37.

¶ 45    Defendant first argues that counsel was ineffective for failing to present to the jury the fact that she had no criminal history. We agree.

¶ 46    Defendant had raised the affirmative defense of entrapment, claiming that she had been induced by the State to commit a crime that she was not predisposed to commit. A person is not guilty of an offense if:

> "[H]is or her conduct is incited or induced by a public officer or employee, or agent of either, for the purpose of obtaining evidence for the prosecution of that person. However, this Section is inapplicable if the person was pre-disposed to commit the offense and the public officer or employee, or agent of either, merely affords to that person the opportunity or facility for committing an offense." 720 ILCS 5/7–12 (West 2008).

As we stated above (*supra* ¶ 40), a defendant who raises entrapment as an affirmative defense necessarily admits to committing the crime, albeit because of improper governmental inducement. See *Bonner*, 385 Ill.App.3d at 145. A defendant must present evidence that: (1) the State induced or incited her to commit the crime; and (2) that she lacked the predisposition to commit the crime. *Ramirez*, 2012 IL App (1st) 093504, ¶ 28. If defendant presents some degree of evidence to

support his defense of entrapment, the burden then shifts to the State to rebut that defense beyond a reasonable doubt. Among the factors to consider in determining whether a defendant was predisposed to commit a crime is the defendant's prior criminal history. *Id*, ¶ 38. To prove predisposition, the State must establish that the defendant was ready and willing to commit the crime without persuasion and before his or her initial exposure to government agents. *Id*.

¶ 47    It is undisputed here that defendant had no prior criminal history. Yet defense counsel failed to present this fact, relevant to defendant's predisposition to commit the charged crimes, to the jury. The State argues that defendant suffered no prejudice from this failure because "a lack of criminal history is not remarkable given that defendant was 23 years old when the incident occurred." The State relies on a single quote from *People v. Evans*, 373 Ill. App. 3d 948, 968 (2007) where the court stated that "the absence of an adult criminal record is not remarkable considering defendant was only 19 years old when he murdered Simmons." That case is factually irrelevant to the case before us. First, the State fails to note that *Evans* involved a trial court sentencing a defendant after a conviction of murder, not an attempt to persuade a jury that the defendant lacked predisposition to hire someone to commit a murder. Further, as the *Evans* court stated, "the record shows that defendant's criminal record includes a narcotics offense a juvenile adjudication for criminal trespass to a vehicle, and a serious arrest record. As mentioned above, defendant was out on bond for a narcotics offense when he killed Simmons." Defendant here had neither an adult criminal record nor a juvenile record and was not on bond for a pending criminal charge.

¶ 48    Contrary to the State's weak argument, what would seem unremarkable to a jury would be a defendant with an *extensive* criminal history attempting to hire someone to kill her ex-boyfriend;

a 23-year-old defendant with no criminal history trying to hire a murderer would seem to be *extremely* remarkable. We find the State's argument lacking.

¶ 49 The State also argues that "other crimes evidence" presented during Weis' testimony, which defense counsel sought to keep out before trial, "would have eliminated any alleged advantage defendant claims she lost." This argument makes no sense. While this alleged activity happened a little over a year before the charged offense, it is, in essence, the *same* offense—an attempt to find someone to murder Garcia. Further, Weis' testimony was only evidence that the jury could either accept or find unpersuasive, not a finding of guilt after a trial or a guilty plea. Weis' testimony did not make defendant's lack of a criminal history irrelevant.

¶ 50 Again, a defendant raising the defense of entrapment must admit to the factfinder that she has committed the charged offense while she lacked the predisposition to commit the offense. See *Ramirez*, 2012 IL App (1st) 093504, ¶ 28. A lack of a criminal record is such an important element of demonstrating this lack of predisposition that counsel's failure to present this evidence is an obvious failure to function as the counsel guaranteed by the sixth amendment such that his performance fell below an objective standard of competence under prevailing professional norms. See *Manning*, 241 Ill. 2d at 327. Further, defendant was, without doubt, prejudiced by this failure. Thus, this ineffective assistance of counsel requires a new trial for defendant.

¶ 51 Defendant next argues that counsel was ineffective for failing to correctly argue for the admissibility of defendant's testimony regarding certain statements made to her by Guajardo. During her direct testimony, defendant was asked about "some help that [Guajardo] offered." When defendant was asked what Guajardo said that he could do for her, the State raised a hearsay objection. Defense counsel argued that it was impeachment of Guajardo because counsel had previously asked Guajardo if he had offered to help defendant by beating up Garcia. The objection

was sustained. Counsel later asked if Guajardo's offer included "some action by him;" when defendant stated that it did, counsel asked, "Could you tell the ladies and gentlemen of the jury what action that was?" The State's hearsay objection was sustained. When defendant was asked why she did not go along with Guajardo's order, her answer concluded with the statement, "He kept saying that I have to do it, that was the only way we can get together." The trial court granted the State's hearsay objection, struck that portion of the answer, and instructed the jury to disregard it. After two more objections, for improper impeachment and hearsay, were sustained, counsel asked for a sidebar, where he unsuccessfully argued that hearsay was permissible for impeachment of Guajardo. Several other questions regarding what Guajardo told defendant were also met with sustained objections for hearsay.

¶ 52    Defendant argues that counsel was ineffective because he should have argued that Guajardo's statements to defendant were admissible as non-hearsay.[2] An out-of-court statement that is used for purposes other than establishing the truth of the matter asserted may be admissible to show the state of mind of the recipient after hearing the statement. *People v. Quick*, 236 Ill. App. 3d 446, 453 (1992). If that statement is offered to prove its effect on the listener's state of mind or to show why the listener acted as she did, it is not hearsay. *Id*. Further, where the intention, motive, or belief of the defendant is material to the issue, she should be allowed to testify directly

---

[2] The State argues that defendant has forfeited this argument because she often uses the term "state of mind hearsay exception" rather than "non-hearsay" in her brief. While the State is technically correct, the substance of defendant's argument was that the statements should have been admitted as non-hearsay, and defendant cited appropriate caselaw to her argument. The State's argument is form over substance, and we decline its invitation to find forfeiture of the issue.

to that fact, and to have the circumstances surrounding the act considered in connection with her testimony. *Id*.

¶ 53    Clearly, Guajardo's statements to defendant were not being offered for the proof of the matter asserted and were not hearsay; however, they were relevant to her entrapment defense and explaining why she did what she did.  Inexplicably, defense counsel did not raise this meritorious argument for the admissibility of this testimony.  Instead, counsel incorrectly argued that the statements were hearsay but were admissible for impeachment of Guajardo.  Counsel's arguments were not the product of sound trial strategy, and they fell below an objective standard of competence under prevailing professional norms.  Further, the prejudice to defendant from counsel's failure to properly argue the admissibility of the testimony is manifest; defendant's entire defense rested on what Guajardo told her and tried to make her do.  Counsel was ineffective in this regard, and this ineffectiveness entitles defendant to a new trial.

¶ 54    Defendant next argues that the trial court committed plain error by failing to answer a question sent by the jury during its deliberations and that counsel was ineffective for failing to submit an answer for the court to submit to the jury.  In general, a trial court has a duty to provide instruction to a jury where the jury has posed an explicit question or requested clarification on a point of law arising from facts about which there is doubt or confusion.  *People v. Childs*, 159 Ill. 2d 217, 228-29 (1994).  This is true even though the jury was properly instructed originally; if a jury makes explicit its difficulties, the court should resolve them with specificity and accuracy.  *Id*. at 229.

> "A trial court may exercise its discretion and properly decline to answer a jury's inquiries
> where the instructions are readily understandable and sufficiently explain the relevant law,
> where further instructions would serve no useful purpose or would potentially mislead the

jury, when the jury's inquiry involves a question of fact, or if the giving of an answer would cause the court to express an opinion which would likely direct a verdict one way or another." *Id*. at 228.

When words in a jury instruction have a commonly understood meaning, a trial court need not define them with additional instructions; this is especially true where the pattern jury instructions do not provide that an additional definition is necessary. *People v. Sanchez*, 388 Ill. App. 3d 467, 477-78 (2009). However, when a jury is confused about a question of law, a trial court has a duty to provide clarification, even though the jury was initially properly instructed. *People v. Landwer*, 279 Ill. App. 3d 306, 314 (1996). A trial court's failure to answer or the giving of a response that provides no answer to the particular question of law posed has been held to be prejudicial error. *Childs*, 159 Ill. 2d at 229 (and cases cited therein).

¶ 55 Here, the jury was instructed with the Illinois Pattern Jury instruction regarding the affirmative defense of entrapment, which stated:

"It is a defense to the charge made against the defendant that he was entrapped, that is, that for the purpose of obtaining evidence against the defendant, he was incited or induced by an agent of a public officer to commit an offense.

However, the defendant was not entrapped if he was predisposed to commit the offense and an agent of a public officer merely afforded to the defendant the opportunity or facility for committing an offense." IPI Criminal 4th No. 24–25.04.

During its deliberations, the jury sent a written question to the court, which read, "Can we please have the legal definition of incited [and] induced[.]" The following colloquy then took place:

MS. ORLAND [Assistant State's Attorney]: Well, I know IPI doesn't define those either, Judge.

MR. VILLALOBOS [Defense counsel]: Black's Law?

MS. ORLAND: Did you want to go ahead? Go ahead.

MR. VILLALOBOS: Maybe Black's Law. I haven't had an opportunity to run back and see what, if anything, it says about incited.

THE COURT: Okay. Here is what I'm going to do. State, do you wish to be heard?

MS. ORLAND: No.

       * * *

THE COURT: *** May we have the legal definition of incited or induced? I am going to not define those for the jury. So I am willing to listen to responses how you would like that to be said. If somebody has a thought with regard to that, [I am] willing to listen.

MS. ORLAND: Something along the general you have been provided with everything, all the law that applies here or something.

THE COURT: All the law that applies to this case is contained in these instructions. Please continue deliberations. Something like that.

MS. ORLAND: Yes.

MR. VILLALOBOS: That's about all we can say."

The trial court then sent a written response to the jury that stated, "All of the law which applies to this case is contained in these instructions. Please continue your deliberations."

¶ 56 We first note that defense counsel did not object to the trial court's failure to define the terms for the jury, nor was the issue contained in defendant's amended motion for a new trial. However, as we have determined that the evidence in this case is closely balanced (see *supra* ¶ 41), we will apply a plain-error analysis.

¶ 57 Our review leads us to conclude that the trial court did err in its response to the jury's question. As we have said, a trial court has a duty to provide clarification to a confused jury, and a court's failure to answer or the giving of a response that provides no answer to the particular question of law posed is prejudicial error. See *Childs*, 159 Ill. 2d at 229; see also *Landwer*, 279 Ill. App. 3d at 314.

¶ 58 The trial court's actions here appear all the more remarkable in light of its actions taken moments before it declined to define the terms for the jury. Approximately one hour before the jury's request for definitions of "incited" and "induced," the jury had sent out a request for a definition of "an agent of a public officer," a phrase contained twice in the instruction regarding the defense of entrapment. In that instance, the trial court gave the parties time to research the issue and researched the issue on its own. The court then heard arguments that included the Criminal Code, IPI instructions (both criminal and civil), and multiple definitions from Black's Law Dictionary before deciding, over defense counsel's objection, to provide a definition from the Civil IPI instructions. In the situation before us, the court gave no time to research the issue and took basically no argument before declining to provide any guidance to the jury. Especially in light of the court's own actions immediately preceding its actions here, the court abused its discretion in summarily declining to define the questioned terms.

¶ 59 Under the same plain error analysis, we also conclude that defense counsel was ineffective for failing to object to the trial court's summary disposition of the jury's question. While counsel mentioned Black's Law Dictionary as a possible source for a response to the question, he failed to ask for an opportunity to research the issue and failed to object to the answer provided. Again, in regard to the jury's prior question, counsel had researched the issue and then objected to the court's

provided answer; we can see no reason why he failed to ask for similar consideration for this jury question and then failed to object to the procedure and answer, thereby failing to properly preserve the issue for appeal.  Instead, he meekly acquiesced with, "That's about all we can say."  Both the trial court's error and defense counsel's ineffectiveness require reversal of defendant's conviction.

¶ 60                                III. CONCLUSION

¶ 61     For these reasons, the judgment of the circuit court of Kane County is reversed, and the cause is remanded for a new trial.

¶ 62     Reversed and remanded.